MORNING GLORY, The .(SCOTT. v.). See Case No. 12,542.

---

## Case No. 9,817.

### The MORNING STAR.

[4 Biss. 62.] [1]

District Court, D. Indiana. May Term, 1866.

COLLISION—FOG—LOOKOUT—TOW-BOAT LICENSE—PASSENGER—DAMAGES—APPORTIONMENT—DETENTION—INTEREST.

1. What degree of care must be used on rivers in the navigation of steamboats, in order to avoid collisions?

2. Under the navigation laws of the United States requiring different licenses for passenger boats and tow-boats, a boat licensed as a tow-boat does not violate those laws by carrying a single passenger, and does not, for that cause, lose her redress for an injury done her by a collision.

3. A steam-tug is not within the rule prescribed by the board of supervising inspectors under the act of congress requiring a steamer when running in a fog to sound her fog whistle. But it may often be her duty to do so under general principles of admiralty law.

4. The rules prescribed by the board of supervising inspectors touching necessary care in navigation are not exclusive. Under the general maritime law there are many other rules equally imperative.

5. If the navigators of a vessel by their negligence directly contribute to her injury by a collision, her owner cannot recover the full amount of his loss. If both boats are in fault, the damage is apportioned.

6. It seems that, in navigating our rivers, a lookout at the stern of the vessel is not required, except when she is backing.

7. In measuring damages in a case of collision, all the direct and immediate consequences should be considered.

8. In settling the amount of the damages in a case of collision. the detention of the injured vessel while undergoing repairs ought to be regarded.

9. A steamer, while towing four barges laden with goods, suffered an injury by a collision with another steamer. The libel did not state to whom the barges and the goods they carried belonged. Held, that the libellant could not recover for the delay to the barges and their lading occasioned by the collision.

10. On damages sustained by a collision, interest should be allowed from the day on which the injury happened till the day when judgment is rendered for them.

In admiralty.

T. D. Lincoln, for libellant.
T. W. Gibson, for respondents.

McDONALD, District Judge. This is a proceeding to recover for a steamboat collision

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

on the river Ohio. John Cobb, the libellant, charges that on the 31st of October, 1864, he was the owner of the steamer Crescent City engaged in the carrying trade on the rivers Ohio and Mississippi; that while in .that business, and while his boat was being landed at Dixon's Bend, about three miles below the city of Evansville, the steamer Morning Star collided with the Crescent City, damaging her to the amount of eight thousand five hundred dollars; and that this collision was occasioned by the negligence of the managers of the Morning Star.

Zachariah Shirley, the president, and Joseph H. Bruce, the superintendent, of the Louisville and Evansville United States Mail Line Company, intervene for themselves and for the owners of the Morning Star, and answer, admitting the collision, but denying the negligence charged, and averring that the collision was caused solely by the negligence of the persons in charge of the Crescent City, and claiming that damage done to the Morning Star by that collision ought to be adjudged against the libellant.

The evidence in the cause is very voluminous, and, in several points, very conflicting. I gather from it the following facts:

On the night of October the 30th, 1864, both the boats lay at the Evansville wharf. Both were bound on voyages down the Ohio. The Crescent City had in tow four or five hay and coal boats. At about five and a half o'clock next morning, she pursued her way down the river about three miles into Dixon's Bend, where, discovering before her a heavy fog, she stopped her wheels preparatory to landing on the Kentucky side. She had been running about seven miles an hour.

Soon after her departure from Evansville, the Morning Star also followed, running about twelve miles an hour, and overtook the Crescent City about three miles below Evansville. The Crescent City was built for a tow-boat; the Morning Star was a very swift passenger boat. Each was duly licensed,—the one as a tow-boat, the other as a passenger boat.

From the time the boats left Evansville till the collision, no person on either boat saw the other boat till a moment before the accident. The morning was clear and fine. There was little fog on the river above the place of the collision. Both boats had a full complement of officers and men. Neither of them sounded a fog whistle before the collision. Neither of them had a stern lookout. On the Crescent City, Brasher, the pilot, was at his proper place, and Bush, the captain, was standing on the deck just before the pilot-house, both keeping a careful observation ahead. On the Morning Star, the pilot, Daulley, was the only lookout, and was at his proper place. It was at that hour the turn for Barr, the mate, to keep a lookout ahead; and on leaving Evansville he took his proper place for that purpose; but sometime before the collision he abandoned his·post, went into the texas, and remained there till the accident happened.

The bank of fog in Dixon's Bend could plainly have been seen by the lookouts on each boat when they were from a quarter to a half mile above it. At the time of the collision, the Crescent City had been floating with her wheels stopped, in the upper edge of this bank of fog, about five minutes, and was in the usual channel, about one hundred feet from the Kentucky shore. At the moment of collision, the proper officer was just about to ring up the hands to land her. The river at that point was about a half mile wide, and the channel about three hundred yards wide. The Morning Star, without checking her speed, ran into this bank of fog; and at the moment of doing so, her pilot discovered the Crescent City just ahead, and instantly rang his bell to stop; but it was too late. The ringing and the collision were nearly simultaneous. The Morning Star struck the Crescent City with great force, five or six feet forward of the stern-post on the starboard side, carrying away the after-guard, staving in the hull a few inches above the water some twenty feet in length, carrying away the water-wheel beam, plummer block, gallows frame, and starboard wheel, and was checked up on the after end of the cylinder timbers. The disabled boat was immediately landed on the Kentucky shore, and the Morning Star, after pausing a few minutes, pursued her way down the river. Both boats were somewhat injured by the collision; but the injury to the Crescent City was far the greater.

I think that the evidence satisfactorily establishes all the foregoing facts. And from them two inquiries arise, namely: Did any fault on the part of the managers of the Morning Star directly contribute to the collision? Did any fault of those on board of the Crescent City directly contribute to it?

I. As to the Morning Star: We have seen that, though the Morning Star, in passing from Evansville to the place of the collision, must have been most of the time in sight of the Crescent City, and a part of the time very near her, yet no person on the former boat saw the latter that morning till a moment before the accident. How shall we account for this remarkable fact? The morning was bright. Daylight had dawned when the first boat rounded out from the Evansville wharf. There was scarcely any fog between that wharf and the place of the disaster. The river there is straight enough to give an unobstructed view in most places through a distance of a mile. At the sharpest bend there, the view of the channel is unobstructed for at least a quarter of a mile. The Crescent City was not in the fog over five minutes. The collision occurred about sunrise. In view of these facts, it seems to me certain that if any lookout on the Morning Star had diligently watched ahead, he must have seen the Crescent City nearly all the way down till she entered the fog bank. For a portion of the way, the boats, while yet both in a clear atmosphere, must have been in close proximity.

To me it is evident that the only possible reason why the Crescent City was not seen, before she entered the fog, by the pilot of the Morning Star, is that he omitted properly to look ahead. If he had looked before him, he would undoubtedly have seen the Crescent City, and have avoided the disaster. The omission to do so was gross negligence, and contributed directly to the collision.

Now, it is clear that at the time of this collision, and for sometime before, the only lookout on the Morning Star was the pilot, Daulley. The captain, Bruce, was in bed, asleep. Barr, the mate, whose duty it was to be on the lookout, tells us himself that he "went into the texas when the boat got straightened down the river between the wharf-boat and the mouth of Pigeon creek." He "went in to change his boots." He left no one to watch in his place. He remained in the texas till the collision. He says he was in the texas before the accident while his boat ran half a mile; and I think the evidence shows it is a good deal more than half a mile from the mouth of Pigeon creek to the place of the collision; it is probably more than two miles. All this time he was neglecting his duty; and this neglect was manifestly a proximate cause of the disaster.

But even if Daulley and Barr had both been at their proper places and keeping a vigilant lookout, I think the Morning Star is chargeable with gross negligence in plunging into the fog bank at the speed at which she did, without giving any notice of her approach. The counsel for the respondents insists that the Crescent City was enveloped in dense, impenetrable fog; and so many of the witnesses swear. Is it careful navigation for any boat, even after she has sounded her whistle, to rush, as the Morning Star did, into an impenetrable fog bank at the rate of twelve miles an hour?

There is, indeed, much contradiction between the witnesses touching the density of the fog. But, so far as the duty of the Morning Star is concerned, I do not see how the truth on that point can make any difference. She was in fault whether the fog was dense or not. If it was very dense, she acted recklessly in running into it with such speed; if it was not dense, her managers, if they had kept a proper lookout, would have seen the Crescent City in time to have prevented the collision.

In taking this latter view, I do not consider as important the fact proved, that under an act of congress the proper board of supervising inspectors had promulgated a rule, then in force, to the effect that, "when a steamer is running in a fog or thick weather, it shall be the duty of the pilot to sound his steam whistle at intervals not exceeding two minutes." It is not important to inquire whether the Morning Star, at the time of this collision, was in a condition in which the spirit of this rule would reach her. For if no such special rule had existed, it would have been, on gen-

eral principles of maritime law, a reckless and unjustifiable act thus to plunge into such a fog, at the rate of twelve miles an hour, without sounding the steamer's whistle or giving any other warning of her approach.

I conclude, therefore, that the negligence of the managers of the Morning Star directly contributed to the disaster in question. Moreover, both by the evidence and the law of the land, nothing is clearer than that the pilot alone is not a sufficient lookout ahead on steamers. The evidence of several of the witnesses shows that this is true. And a high American authority declares that "in respect to a lookout, it is not enough that a person is stationed in the pilot-house for that purpose; but a vigilant watch should be placed in the forward part of the steamer, so situated as to be able to discern vessels at the earliest moment." Pars. Mar. Law, 198, 199. And this is settled law in the supreme court of the United States. St. John v. Paine, 10 How. [51 U. S.] 557; The Genessee Chief v. Fitzhugh, 12 How. [53 U. S.] 443. In the case of The Europa, 2 Eng. Law & Eq. 557, it was held that a steamer going at the rate of twelve and a half knots an hour, in a dense fog, seven hundred miles from land, must have the most complete lookout that can be adopted; and that merely one lookout on the bridge, a quartermaster on the top gallant forecastle, one at the wheel, and another at the con, was not a sufficient lookout. It may, indeed, be said that this last case differs from the one at bar, as being the case of a steamer navigating the ocean. But it may well be answered that there is more danger of collisions in navigating the Ohio amid a fog, where all passing boats must keep within a comparatively narrow channel, than on the ocean where the channel is as wide as the sea itself.

II. Did any fault of those on board of the Crescent City contribute to the accident? It appears by the evidence that this steamer was fully manned. Her captain was on the lookout before the pilot-house. Her pilot was at his post giving due attention. And her engineers were both at their places promptly responding to orders. The captain especially seems to have been acting with proper care. He swears that as they proceeded from Evansville "there was a light, misty fog on the river, but not so that we considered it dangerous to run. We could easily see either shore. When we got down into Dixon's Bend, there was a heavy bank of fog ahead of us about three quarters of a mile; and we ran close into the Kentucky shore, about seventy-five or one hundred feet from the shore, preparatory to landing. Our calculation was to stop and let her lose her headway, and then back her in. About a minute or a minute and a half after we rung our bell to stop, the Morning Star ran into us." This has the appearance of a simple, reasonable, truthful story. It is uncontradicted by any witness,

and it challenges my belief. And indeed I cannot see that there is the slightest evidence of any fault on the part of the Crescent City, except in three particulars which are earnestly and ably urged by the respondents' counsel. To these we will now attend.

1. It is urged that at the time of the collision, the Crescent City was carrying passengers; that she was not licensed as a passenger boat according to the act of congress; that she was therefore unlawfully in the place where she was injured; and that, consequently, she has no legal right to demand redress for that injury.

If this boat was really a passenger boat within the meaning of the acts of congress on the subject of licensing steam vessels, it must, in view of the decision in the case of The Maverick [Case No. 9,316], be a very serious question whether the libellant can, under any circumstances, succeed in this cause.

But was the Crescent City "a carrier of passengers" within the purview of the acts of congress? It is certain that she was licensed merely as a tow-boat. It is in proof by Joseph O. Small, a witness for the libellant, that he was a passenger on her. He swears thus: "I was a passenger. I got on board at Louisville, and was going to Shawneetown. I had charge of the barges on the trip before." This is all the evidence touching passengers. Does it make the boat a passenger boat within the purview of the acts of congress? It does not appear that he paid for his passage. As he had been in charge of the barges on the last trip of the boat, it might be fair to infer that he was carried gratis. If what he relates makes the Crescent City a passenger boat, then every vessel, licensed merely as a freight or tow-boat, must at its peril see that no human being not an employé shall, under any circumstances, go a single mile on board of it. I have met with no authority on this point. But I think the act of congress should receive a more liberal construction. I think that no single individual passing on a tow-boat from one point to another on the line of its voyage, whether he goes gratis or not, would make it a passenger boat within the meaning of the law. "One swallow does not make a summer." I suppose the law, in mentioning boats "carrying passengers," means at least more than one passenger, and probably includes such vessels only as make the carrying of passengers a business, or at least hold themselves out to the public as such carriers. I think, therefore, that this objection ought not to prevail.

2. It is contended on the part of the defense that, under the circumstances, the Crescent City ought to have sounded her fog whistle. It seems pretty clear that the rules prescribed by the board of supervising inspectors under the act of congress which requires steamers when running in fog to sound their steam whistles, does not apply to tow-boats. See Act Aug. 30, 1852, § 43 (10 Stat. 61).

And if the act did apply to such vessels, it might be doubted whether the Crescent City, when she had stopped her wheels and was preparing to land, could be said to be running in fog within the meaning of said rule. Yet it may be urged with much reason that, without any special rule under said act, any vessel may be in such a condition as to make it her duty to give warning by sounding her steam whistle. Of this there can be no doubt. It were absurd to suppose that since the promulgation of the rules prescribed by the board of supervising inspectors, a due observance of all those rules includes every duty devolving on the navigators of steamers. When none of these special rules apply, the more general rules of admiralty law govern; and one of these rules is that "a plaintiff in a cause of collision must prove both care on his own part, and the want of it in the defendant." 1 Pars. Shipp. & Adm. 529. And it is clear that if the plaintiff by his negligence substantially contributes to the collision, he must at least bear half the loss. Sills v. Brown, 9 Car. & P. 601.

It is, then, a grave question whether the Crescent City, under the circumstances of the case, omitted the exercise of proper care by not sounding her whistle, and thereby substantially contributed to the collision. What is proper care, depends on the particular circumstances of each case. In the case at bar, it appears that when the captain of the Crescent City discovered ahead of her a fog bank, he determined to land, and was, with reasonable diligence, preparing to do so. He stopped the wheels, ran, as he swears, "close into the Kentucky shore, about seventy-five or one hundred feet from the shore, preparatory to landing," and was about to ring up the hands for that purpose when the collision occurred. All this seems to have been proper care. But his boat was in the usual channel, and was in a fog; ought then the whistle to have been sounded? This must, I think, depend, to a great extent, on the density of the fog, as the captain and pilot then saw and judged of it. There is no doubt that these two men were keeping a proper lookout; nor is there any question as to their skill. One of them thought and spoke about sounding the whistle; and he swears that he did not deem the fog so dense as to require it. A number of witnesses in the defense, indeed, testify that the fog was extremely dense. And so it may have seemed to them, and may have been, at the moment when, and the point from which, they observed it. But, on the other hand, the captain, the pilots, the first and second engineers, the carpenter, and several other witnesses, all of whom were on the Crescent City, and seem to have had fair opportunity to observe, swear that the fog in which they were was not very dense, that they could see plainly all around them, and that they could see even the shores on both sides of the river. Now as I have said in regard to the witnesses on the defense, I suppose I may justly say in relation to these witnesses, what they thus state may have seemed to be the fact, and, may have been the fact, at the moment when, and at the point from which, they observed the fog. Under these circumstances, the captain and the pilot at the wheel say that they judged the sounding of the whistle to be unnecessary. It may be that they would have judged otherwise if they had seen things as the witnesses for the defense say they saw them. It may even be that they judged unwisely. It can hardly be believed that they intentionally erred. They acted, I think, on good motives and on their best judgment. I suppose, therefore, that, under the circumstance, they are not chargeable with any negligence in not sounding the fog whistle.

3. It is urged in defense, that the Crescent City was guilty of carelessness in not having a lookout at her stern at the time of the disaster. Excluding from consideration the depositions on this point, taken since the submission of this cause, I think the weight of the evidence is, that the omission of a stern lookout was not, under the circumstances of the case, want of due care. Such a lookout is certainly unusual; and it appears that experts deem it unnecessary, except when the steamer is backing or running astern. Nor do I see how, if there had been such a lookout, he could have prevented the collision. I think there is nothing in this point.

It remains only to settle the amount of damages in which the Morning Star ought to be condemned. In measuring damages in a case of collision all the direct and immediate consequences are to be taken into consideration. 1 Pars. Mar. Law, 204. Whether damages ought to be allowed for the detention of the injured vessel while undergoing repairs, was formerly much questioned. And the United States supreme court once ruled against the allowance. Smith v. Condry, 1 How. [42 U. S.] 28. But the contrary doctrine is now settled. Barrett v. Williamson [Case No. 1,051]; Williamson v. Barret, 13 How. [54 U. S.] 101; 1 Pars. Mar. Law, 204. note 2.

Whether, under the circumstances of the present case, anything ought to be allowed for the detention of the four boats which the Crescent City had in tow at the occurrence of the disaster. may be a question of doubt. The libel alleges that the libellant was the owner of the Crescent City; but it fails to tell us who owned the barges she had in tow. Its only averment on the point is, "that at the time of the said injury the said Crescent City had four barges in tow,—three loaded with hay, and one with coal.—which were being taken to Memphis to be delivered to the United States government there." From this language, I rather infer that these barges with their contents were the property of the government; and, if so. I think it clear that

the libellant can not recover for their detention. Therefore, I shall allow nothing for the detention of the barges.

As to the detention of the Crescent City for necessary repairs, I have no hesitation in allowing damages. To determine how much ought to be allowed for this is, however, a little difficult. On this point there are but two witnesses, Capt. Bush, and the pilot, Brashier, and they differ both as to charter value per day and the time of the detention.

As to the value per day, Bush puts it at one hundred and twenty-five dollars, and Brashier at one hundred. They appear to be equally competent to judge of that question. Under such circumstances, I deem it best to follow Lord Bacon's rule, namely, that, in a question of doubt as to value, the lowest sum shall be taken. I shall therefore allow one hundred dollars per day for the time of detention.

Touching the time during which the boat was necessarily detained for repairs, Bush says it was thirty days, and Brashier swears it was about twenty. Bush superintended the repairs every day but one, and kept the accounts, and paid the bills; and being captain of the boat, he would be more likely to know the exact time than the pilot Brashier. I think, therefore, he is the more reliable witness as to the time, and I shall follow him on this point, and allow for thirty days' detention for necessary repairs.

Then, the amount of damages for the detention, to effect the necessary repairs, will be three thousand dollars. On this sum I will allow interest from the 31st of October, 1864, to this day,—two hundred and seventy-one dollars and fifty cents.

As to the expense of repairs, including work, materials, loss of time and boarding of crew, &c., Capt. Bush, who kept the account and paid out these expenses, is the only witness. He gives the various items in his deposition, and being uncontradicted, and apparently fair, I allow them as they stand on his testimony, at thirty-seven hundred and seven dollars and twenty-six cents.

On this sum I allow interest from December 1, 1864, to this day,—three hundred and sixteen dollars and forty-four cents. The aggregate is seven thousand two hundred and ninety-five dollars and twenty cents. I therefore assess the libellant's damages at the sum of seven thousand two hundred and ninety-five dollars and twenty cents. And the proper judgment will be rendered in favor of John Cobb, the libellant, for this amount, and also for the costs of this suit.

NOTE. At common law, if both vessels are in fault, neither can recover in the case, though the fault be ever so unequal; while in admiralty the loss is equally divided. See 1 Pars. Shipp. & Adm. 525, 526, and note 1 et seq., for an exhaustive collection of authorities. If one of the colliding vessels is guilty of some fault, she must show fault in the other, and that her own negligence was not the cause of collision. Ward v. The Fashion [Case No. 17,154]; 1 Pars.

Shipp. & Adm. 529, and note 2. The proper position of a lookout is generally forward, but reference must be had in all cases to the question whether the lookout could not see as well where he was as in any other position. The Morning Light, 2 Wall. [69 U. S.] 550, 558; 1 Pars. Shipp. & Adm. 576–578. Quaere, how far is a sailing vessel bound to keep a lookout for vessels coming up from astern? The Emma, Holt, Rule of Road, 209. If the collision was not owing to the absence of a watch the vessel will not be considered in fault. Mellon v. Smith, 2 E. D. Smith, 462. "Whether damages are to be allowed for the detention of the injured vessel while undergoing repairs, may not be certain; but the later, and we think the better, mode allows them." 1 Pars. Shipp. & Adm. 539, 540, and note 1, and cases there collected.