# THE GALILEO.

## THE HEINRICH AND TONIO.

## THE EDGAR BAXTER.

RIEDEMANN and others *v.* THE GALILEO and another.

WILSON and others *v.* THE HEINRICH AND TONIO and another.

*(Circuit Court, S. D. New York. 1886.)*

1. COLLISION—STEAMER AND VESSEL IN TOW—NEGLIGENCE.

    A tug, while towing a bark, was approaching a steamer. The steamer's signal to pass to the right was answered, and that direction taken by the tug and tow, as far as the presence of another tug which was approaching (with a vessel in tow, on the left) would permit. The steamer, notwithstanding said signal, was observed by the tug to be backing and coming athwart the course of the tug and tow. The tug, when about 200 yards away from the steamer, blew danger signals, which were not answered, the steamer continuing to back down upon the tug, which kept her course without, however, slackening speed. The rudder of the steamer struck the towing hawser astern the tug. The tow immediately cast off her hawser and starboarded her helm to ease the blow, when it was seen to be inevitable. The vessels collided, and, in consequence of injuries received, the bark was towed back to port to be repaired. *Held*, in an action for damages brought by the owners of the tow against the steamer and the tug, that the libelants were entitled to a decree against both vessels, and in an action brought by the owners of the steamer against the tug and the tow the libel should be dismissed as to the tow, and the libelants should have a decree for half the loss against the tug.

2. SAME—DEMURRAGE—RATE—REASONABLE ALLOWANCE.

    An allowance for demurrage was sustained, in the absence of any evidence that the rate provided in the charter-party of the vessel, which also appeared to be the customary rate at New York, was unreasonable.

In Admiralty. See 24 Fed. Rep. 386.

In the first of these actions the libel of the owners of the bark Heinrich and Tonio against the steam-ship Galileo and the tug Edgar Baxter, filed to recover damages sustained by a collision between the bark while in tow of the tug and the steam-ship, was dismissed by the district court as against the tug, and a decree ordered as against the steam-ship. In the second the libel of the owners of the Galileo against the tug and the bark in tow to recover damages sustained by the same collision was dismissed by the district court. In the first action appeals were taken to this court by the libelants and by the owners of the steam-ship from so much of the decree as dismissed the libel against the tug, and in the second action an appeal was taken by the libelants.

### FINDINGS OF FACT.

(1) William A. Riedemann, of Geestemunde, and Albert Nicolaus Schutte & Sons, of Bremen, libelants in the action first above entitled, are and were on April 5, 1885, the owners of the Heinrich and Tonio, of Geestemunde, Germany, a bark of 1,091 tons register.

(2) Charles Henry Wilson and Arthur Wilson, of Hull, England, libelants in the second action above entitled, are, and were on April 5, 1885, the owners of the British steam-ship Galileo, of Hull, England, a large ocean screw steam-ship, plying between New York and Hull, brig rigged, about 350 feet in length, and of 2,990 tons register.

(3) Jarvis Masters, Peter Cahill, and the executor of Margaret Moran, deceased, claimants and appellees in both above actions, are, and were on April 5, 1885, the owners of the steam-propeller Edgar Baxter, a tug-boat engaged in towing vessels in and about the harbor of New York.

(4) On April 5, 1885, the Heinrich and Tonio had been lying at Bayonne, New Jersey, where she had taken on a full cargo of refined petroleum, in barrels, for a voyage under charter from New York to Bremen, Germany. Shortly after 9 o'clock A. M., said bark was taken in tow by the tug Edgar Baxter, upon a 50-fathom hawser astern to be towed to sea.

(5) The weather was clear and fine, wind blowing a moderate breeze from the westward, and tide flood.

(6) When the bark passed out of the Kills and headed down for the Narrows, while being towed as aforesaid, she set her stay-sails and jibs, but remained otherwise without any propelling power of her own, and was towed by the tug at a speed of about five miles an hour. Her own speed by the aid of her sails, irrespective of the momentum imparted to her by the tug, was little more than sufficient to overcome the tide.

(7) Said bark was well and properly officered and manned, an able seaman had her wheel, who steered straight after said tug, and the officers and crew were attending to their duties, with an experienced and duly-licensed pilot on board in charge.

(8) The tug and bark, in tow as aforesaid, proceeded on the usual course down New York bay, heading about S. by E., intending to pass through the Narrows to sea. While keeping a little to the westward of the center of the channel, and near Clifton, the persons in charge of said bark saw on their port bow, at a distance of about half a mile, a steam-ship, which afterwards proved to be the Galileo, lying head to the eastward, apparently nearly at a right angle to the course of said tow.

(9) The steam-ship Galileo had come in from sea, and had been visited by the health officer at quarantine, and was about to proceed on her way up the bay. While waiting, she had headed across and somewhat down the channel, and had been going ahead and astern, gradually heading more to the eastward, endeavoring to head up the bay on her proper course. A Sandy Hook pilot, the master, and third officer were on the bridge directing the course of the steam-ship. When the tug and tow had come within about 400 yards, said steam-ship was heading about E. by S., or between that and S. E. At this point the bay is about a mile and a half in width. Ahead of the Galileo the depth of the water in the channel was such that she could have gone in sufficient water 200 or 300 yards to the eastward. Astern and below the Galileo, a large vessel was being towed in from sea by the tug Cyclops, which was heading northerly and to the westward of the Galileo, and on the starboard bow of the Edgar Baxter and the bark. The Edgar Baxter and her tow were keeping a straight course midway between the tug Cyclops and the stern of the Galileo.

(10) When the vessels were in this position, and the Galileo's stern was about two points on the port bow of the Edgar Baxter, the pilot of the Galileo blew one blast of her whistle, signifying to the tug to pass to the right under the Galileo's stern. Immediately, one assenting blast was blown by the Edgar Baxter, and her helm was ported so as to head her about one point more to the westward, which was as far as the presence of the Cyclops and her tow would permit. This change of direction was immediately followed by said bark.

(11) The Galileo was then observed by said tug to be backing, and, notwithstanding said whistle, to be coming athwart the course of said tug and bark.

Shortly thereafter, and when the Baxter was about 200 yards away from the Galileo, the Baxter blew several short, sharp, and rapid blasts of her whistle as danger signals, and also a long whistle, followed by more short, rapid blasts. The Galileo did not respond to these signals, or, if she did, no response was heard by the Baxter or her tow, and the Galileo continued to back down upon said tug, and the tug continued without slacking speed until the two vessels almost touched. The rudder of the Galileo struck the towing hawser just astern of the Edgar Baxter, the latter becoming at the same moment shut out of view from the bark by the hull of the Galileo, which continued to back across the bark's bows.

(12) Immediately said bark cast off her hawser and starboarded her helm to ease the blow which was seen to be inevitable. The starboard bow of the bark struck the port side of the Galileo just abaft the fore-rigging a glancing blow, carrying away the bark's jib-boom and the rigging attached, the martingale, the foreyard, the fore-top-gallant mast, also breaking in the starboard bow about 20 feet, breaking bulwarks and beams of forecastle deck, and timbers and frames, and doing other damage to the bark, as well as some considerable damage to the side and upper works of said steam-ship.

(13) Said vessels cleared each other by said bark passing ahead of said steam-ship, where she was again taken in tow by said tug and brought back to New York to be repaired.

(14) At the time the Galileo blew her first whistle to the Edgar Baxter, which was about two or three minutes before the collision, her engines had been backing, and they were not set ahead until so near the moment of collision as to be ineffectual to stop the Galileo's sternway. The record of the engineer's log contains no entry of starting the engines ahead at all during the four minutes before the collision, which is recorded as occurring at 9:58 A. M.

(15) The following rules and regulations among others for the government of pilots, as revised, amended, and adopted by the board of supervising inspectors, under authority of the act of congress, to provide for the better security of life on board of vessels propelled in whole or in part by steam, and for other purposes—now enacted in title 52 of the Revised Statutes of the United States—were in force and applicable to the proper navigation of those steam vessels at the time of this collision, viz.:

"Rule 1. When steamers are approaching each other 'head and head,' or nearly so, it shall be the duty of each steamer to pass to the right or port side of the other, and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give as a signal of his intention one short and distinct blast of his steam-whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam-whistle, and thereupon such steamers shall pass to the right or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head,' or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam-whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam-whistle, and they shall pass to the left or on the starboard side of each other."

"Rule 2. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle, and, if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

"Rule 6. The signals, by the blowing of the steam-whistle, shall be given

and answered by pilots in compliance with these rules, not only when meeting 'head and head' or nearly so, but at all times when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

"N. B. The foregoing rules are to be complied with in all cases except when steamers are navigating in a crowded channel, or in the vicinity of wharves; under such circumstances steamers must be run and managed with great caution, sounding the whistle as may be necessary, to guard against collision or other accidents."

(16) The Galileo did not observe the foregoing rules, and disregarded her own signal of a single blast of her whistle, and thereby contributed to bring about said collision.

(17) The tug and bark could and would have passed safely under the Galileo's stern, if the Galileo had remained where she was when her first whistle was blown, or if the Galileo had promptly checked her sternway by setting her engines ahead as soon as her signal had been given and answered.

(18) The Edgar Baxter and the bark, after the first exchange of whistles, ported and went as far to the westward as was safe on account of their proximity to the course of the Cyclops and her tow.

(19) The Edgar Baxter complied with the inspectors' rules, except that she did not slow at all. As soon as the pilot of the Edgar Baxter saw that the Galileo was coming astern, he observed rule 3 by blowing several short and rapid blasts of the whistle. He then blew a single blast, but received no answer from the Galileo.

*Foster & Thomson* and *E. C. Henderson,* for the Galileo.
*Hill, Wing & Shoudy* and *H. Putnam,* for the Heinrich and Tonio.
*Owen & Gray* and *Frank D. Sturges,* for the Edgar Baxter.

WALLACE, J. It is entirely clear that the primary fault contributing to the collision between the steamer and the bark in tow of the Baxter was the failure of the steamer to keep out of the way of the tug and her tow, by passing to their port side, conformably to the signals which had been interchanged between the steamer and the tug. It is doubtful whether the nineteenth rule of navigation (section 4233) applies to a case like this, where a vessel under steam, lying nearly crosswise near the middle of a navigable channel, is not on a defined course crossing that of another vessel under steam, and having the latter on her starboard side, but is attempting to turn about by backing and then going forward for short distances. Whether this rule applies or not is not important, because the steamer had signified her intention to pass to the port side of the tug and tow, pursuant to rule No. 1 of the board of supervising inspectors, by one blast of her whistle, and the tug had consented promptly by the answering signal. The steamer failed to keep her promise with proper alertness by neglecting to put her engines at speed ahead as promptly as she should. If she had done this there would not have been a collision. But the tug, when a couple of hundred yards away, observed that the steamer was moving astern, thus bringing herself across the course of the tug and tow, and gave the danger signals required by rules 3 and 6 of the board of supervising inspectors. During the 200 yards of distance which had intervened after the first signals were given, it was the duty

of the tug to carefully observe the movements of the steamer. She saw, or was bound to see, that the steamer, instead of so controlling her movements as to pass to the port side of the tug, was moving in an opposite direction. Her captain states he discovered the steamer was moving astern directly after he had answered her signal. The danger signal given by him manifested his opinion at the time that the steamer's movements were such as to involve risk of collision with the tow unless they were promptly counteracted by a forward movement. He saw, as these signals demonstrate, that, notwithstanding the promise of the steamer so to control herself as to permit the tug and tow to pass to the westward, she was so tardy in her maneuver that the situation was growing critical. Was he justified in relying upon her promise in the face of her conduct to the contrary? The language of the twenty-first rule is imperative and plain. It applies from the moment when the approach of vessels is such as to involve risk of collision between them. In *The Beryl*, 9 Prob. Div. 137, the court, in considering the English statute which employs language identical with ours, say that "the right moment of time to be considered is that which exists at the moment before the risk is constituted." The rule does not permit the calculation of chances and the weighing of probabilities, because risk intervenes the moment this becomes necessary; and it certainly cannot be material whether the risk depends upon the contumacy of the other vessel, or her supineness in fulfilling her obligations, or the probability that she will perform her duty, or upon circumstances quite independent of such chances.

Assuming that, when the captain of the tug gave the first series of danger signals, he believed there was yet time for the steamer to redeem her promise and pass to the eastward before the tow could reach the line of her course, and that she would exert herself to her best ability in that behalf, how is he excused for keeping on at full speed for 200 yards further when he saw that the steamer still continued to make astern, and that the risk of collision with the tow was becoming rapidly more imminent? The rules of navigation are obligatory upon vessels approaching each other, not only from the time the necessity for precaution begins, but continue obligatory as the vessels advance so long as the means and opportunity to avoid danger remain. There seems little room to doubt that, if the tug had slowed or stopped and cast off the hawser of the tow at any moment of time before the tug had passed the stern of the steamer, the tow could have avoided the steamer by hard starboarding her helm. When the tow's helm was hard starboarded the steamer was abreast of the bow of the tow, and about one-third her length past, and the tug had passed the stern of the steamer nearly 100 feet, keeping to the starboard as far as she could, to avoid the Cyclops and her tow. The bark, under the helm hard a starboard, came around before the wind at a distance of less than 250 feet from the steamer, and fell off about three points to the eastward, striking the steamer a glancing blow at

a point about 100 feet from the steamer's bow. A fair test of the probable success of seasonable action is the partial success which is shown to have followed dilatory action; and, applying this test, it would seem that, if what was finally done by the tug and tow had been done when the tug was not nearer than 100 yards to the steamer, the collision would have been avoided. The burden of proof rests upon the tug to show that her failure to obey the statutory regulation did not contribute to the collision. The proofs do not exonerate her.

It appears from the opinion of the learned district judge that he deemed the tug excused from fault partly upon the assumption that after she had given the first danger signal the steamer repeated the signal of one blast, and thus in effect informed the tug that she could keep out of the way, and authorized the tug to act upon that belief. Although the pilot of the steamer testifies that he replied to the first danger signal of the tug by a single blast of his steam-whistle, this statement is in plain conflict with the allegations in the pleadings of both the tug and the tow, as well as with those of the steamer, and is opposed to the concurring testimony of all the other witnesses. Even if the signal was given, it was not heard, and therefore could not have been acted on by those in charge of the tug or tow. Although the conduct of the steamer in neglecting to put her engines at speed ahead after she had given signals that she would pass to port, and had received an assenting signal from the tug, was a flagrant violation of duty, and although the conduct of the tug in relying too long and implicitly upon the intention and ability of the steamer to perform her promise was a comparatively venial fault, it must be held that the tug must bear the consequences of omitting to do what the statute requires, by contributing to the payment of the loss.

It is urged that the tow was also in fault for not sooner casting off her hawser and starboarding her helm. The tow was not absolved from the duty to take all reasonable and prudent measures demanded by the circumstances to avoid a collision merely because she was relying for her motive power upon the tug, but she was under the control of the tug, and did not have that control over her own movements which steam vessels possess, or which she would have had if relying only upon her own sails, and it was her duty to keep her course and conform her movements to those of the tug until it was obvious that she could no longer do so with safety to the steamer. It was not obligatory upon her to cast off her hawser and starboard her helm as soon as the approach of the vessels involved risk of collision, but only when it was obviously necessary to do so in order to avoid collision; that is, when she ought to have been aware that the steamer could not keep out of the way. Until then she had a right to suppose that she would not be led by the tug into dangerous proximity to the steamer. *The John Fraser*, 21 How. 193. If she had assumed to act upon her own responsibility at an earlier period of the approach, she would have been responsible to the steamer for any miscarriage.

Although she might have cast off her hawser sooner, that was an act only to be adopted *in extremis*, and is not a fault of which the steamer can justly complain.

The conclusion is therefore reached that, in the action brought by the owners of the tow against the steamer and the tug, the libelants are entitled to a decree against both vessels, with costs of the district court and of this court; and, in the action brought by the owners of the steamer against the tug and the tow, the libel should be dismissed as to the tow, with costs of the district court and of this court, and the libelants should have a decree apportioning the damages against the tug, with the costs of this court.

The exception by the owners of the steamer to the allowance included in the master's report of damages for demurrage is without merit, in the absence of any evidence offered by them to show that the rate provided in the charter-party of the vessel, which also appears affirmatively to be the customary rate at New York, is unreasonable because of any special circumstances.