THE SENATOR D. C. CHASE.

THE NEWARK.

(Circuit Court of Appeals, Second Circuit.   March 11, 1901.)

No. 115.

COLLISION—STEAMER AND TOW—TUG AND TOW DRIFTING.

The tug Chase had taken out a tow from the south side of a pier at Communipaw by a line, and, when 150 or 200 feet beyond the end, stopped to make the tow fast to her side. The action of the tide carried both vessels northward some 150 or 200 feet, and about opposite the center of the adjoining slip, which was 300 feet wide. While in that position, the steamer Newark, coming down the river, and desiring to enter the slip, signaled, but received no answer. She made a second signal, and

then slowed, but did not reverse nor change her course until within 200 feet of the tow, and came into collision with it. *Held*, that both steamer and tug were in fault for the collision,—the former, for not reversing sooner, when her signals were not answered, or changing her course, which she might have done by going nearer the piers, and still entered her slip; and the tug, for failing to keep a lookout at the stern while the vessels were being drifted in that direction, and for not giving attention to and answering the signals of the steamer, the duty of care to avoid collision being as imperative in her situation as though she were actually being navigated.

Appeals from the District Court of the United States for the Southern District of New York.

The following is the opinion of the district court (BROWN, District Judge):

In the above case I find the following facts:

(1) That the collision occurred about 150 or 200 feet outside of the slip, between the Communipaw and the Liberty coal docks, Communipaw (piers 8 and 9), and about off the middle of that slip, which is 300 feet wide; that the blow was one of considerable violence, the Newark coming up nearly directly astern of the Starr, and with her stem striking the stern of the Starr, which was in tow and on the starboard side of the Chase; that the blow caused three of the lines to part by which the boats were lashed together, and at the time of the collision both the Starr and the Newark were headed downriver and somewhat towards the shore; the Newark, a little more than the Chase.

(2) That the Newark had come down from Jersey City some 300 or 400 feet off the line of the docks, and was bound for the slip between piers 8 and 9; that when about 1,500 feet above the Chase, the latter was observed to be made fast on the starboard side of the Starr, her stern pointing upward and a little outward, off pier 9, and apparently backing; that the Chase had taken the Starr out from the lower side of pier 9, and in the flood tide was in fact moving upriver at the time she was first seen from the Newark; that the Newark at that time gave a signal of one blast to the Chase to indicate that the Newark desired to go to the right and into her slip; that the Newark was then under a slight port wheel and was rounding somewhat towards the slip; that getting no answer to this signal, she gave another blast of one whistle, when about 500 or 600 feet from the Chase, and slowed her engines, and that getting no answer to this signal, she sounded danger whistles when about 100 or 200 feet from the Chase, and reversed, but struck her nearly end on, as above stated, and was moving ahead at collision.

(3) That the Chase had no lookout astern; her pilot did not notice any signals prior to the danger signal, which he says was when the Newark was within 50 feet of him; that previously to that time the Chase's engines had been put ahead, with a starboard wheel, in order to turn her tow to port; that the Chase did not move upriver more than 200 feet at the most above pier 9, and was not moving upriver at the time of collision.

Upon these facts I find the Newark to blame, (a) for not avoiding the collision by reversing earlier than she did; (b) for keeping on, headed mainly for the Chase and her tow, and not reversing at least as early as her second signal, when that whistle was not answered; and (c) for neither turning to starboard to enter her slip near pier 8, as she might have done, nor checking her speed and porting sufficiently to do so. The inattention of the Chase to the Newark's whistles must have been manifest to the Newark. The Chase, moreover, was incumbered by a heavy tow, while the Newark was under perfect and easy command; so that the collision on the part of the Newark was needless. The Newark's little change of heading prior to collision makes it certain that if her helm was put hard a-port at all, that was not done until very shortly before the collision, and that the master's intimation to the contrary cannot be correct. The wheel was mostly but little to port, as other parts of the Newark's evidence show.

The Chase must also be held to blame for inattention and heedlessness. Though backing upriver, she had no lookout astern and evidently paid no

attention to what was above her. The Newark, being bound for the slip between piers 8 and 9, had the same right to enter the slip that the Chase had to maneuver outside of it. The ordinary rules of navigation in such circumstances are not strictly applicable; but the duty of careful attention to what is going on, and the duty to respond to all proper signals in order to avoid disaster, are equally incumbent upon both. The Newark was coming down in plain sight and her whistles were distinctly given at suitable distances. Inattention by the Chase to everything astern of her while moving up astern and partly across the slip, was inexcusable. I cannot regard this inattention as immaterial. It was important for the Newark to know the intention of the Chase. Had the Chase responded with one whistle, that would have signified that she was going to the eastward and that the Newark might safely go to the right into her slip. A response of two whistles would have indicated the contrary, and the Newark would have been bound to keep off. The Newark was entitled, therefore, to an answer; and the failure to answer both the first and the second signals of the Newark naturally conduced to delay in the Newark's maneuvers though not wholly justifying it; and it was this delay which really brought about the collision. An additional reason why answering signals should have been given by the Chase is that the flats off pier 9 might have made it necessary for the Chase to back further towards pier 8 than she did, depending upon the draft of the Chase or of her tow, which were not known to the Newark; so that the fact that the Chase and her tow were headed downriver was no indication that they were not intending to back up across the slip as far as pier 8 in order to get out into the river. This fact, however, does not lessen the fault of the Newark, but shows that all the more should the Newark have checked her speed earlier than she did, instead of running almost straight upon the barge's stern.

As both contributed materially to the collision, the decree for the libelants should be against both with costs.

De Lagnel Berier, for the Senator D. C. Chase.

James E. Carpenter, for the Newark.

Le Roy S. Gove, for appellee.

Before LACOMBE and SHIPMAN, Circuit Judges.

PER CURIAM. We concur with the district judge in his findings of fact, as we understand them. It is, no doubt, true that after the tug cast off the line by which she hauled the barge out from the south side of dock No. 9, and placed herself alongside her tow, she did not back her engines; but the opinion of the district court does not, as we read it, find that she did. Undoubtedly, however, while she lay there, making fast, with her stern pointing upward and a little outward, she and her tow did move upstream with the tide, and presented the appearance of backing. A majority of the witnesses, including some of the disinterested ones, testify that she did not so move substantially beyond the north line of pier 9, but the district judge who heard them credited the others, who testified to a much longer backward movement; and it is highly improbable that the Newark, bound in from above to a berth on the south side of pier 8, should have run straight across the slip to a point barely 20 feet north of pier 9. We are satisfied, as was the district judge, that the tug moved upward stern-first not only for the width of pier 9, but also for half the width of the slip besides,—more than 150 feet altogether. Upon such a finding, and on the other facts, which are not so sharply disputed, the conclusion of the district judge as to faults of navigation is correct. Decree affirmed, with interest, and one bill of costs to libelant.