**LEHIGH VALLEY RAILROAD COMPANY, as owner of the BARGE known and called LEHIGH VALLEY NO. 357, Libellant,**

v.

**The TUG BLACKJACK 21, her engines and equipment and the TUG PETER MORAN, her engines and equipment and against John J. Reichert, Reichert Towing Line, Inc., and TUG WILLIAM J. MORAN, INC., and Moran Towing & Transportation Company, Respondents.**

United States District Court
S. D. New York.
May 7, 1962.

Pyne, Smith & Wilson, New York City, proctors for libellant, Albert Robin, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, proctors for Moran, Kenneth H. Volk, New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, proctors for respondent, Reichert Towing Line, Inc., Maurice F. Beshlian, New York City, of counsel.

LEVET, District Judge.

This libel of the Lehigh Valley Railroad Company, as owner of the barge known as the Lehigh Valley No. 357, seeks recovery against the tug Blackjack 21, and the tug Peter Moran, and against John J. Reichert, Reichert Towing Line, Inc., and Tug William J. Moran, Inc., and Moran Towing & Transportation Company, as respondents, for damage sustained to the said barge Lehigh Valley No. 357 on September 19, 1960, in Gowanus Creek, Brooklyn, New York.

The proposed findings of fact, conclusions of law and briefs of the parties having been received, the court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT

1. Lehigh Valley Railroad Company, the libellant, is a corporation organized and existing under the laws of the State of Pennsylvania, with an office and place of business in the Borough of Manhattan, New York City, within this district; and at all times herein mentioned was the owner of the barge known and called Lehigh Valley No. 357 (hereinafter "No. 357").

2. The tugs Blackjack 21 and Peter Moran are now and at times hereinafter mentioned were within this district.

3. Respondents John J. Reichert and Reichert Towing Line, Inc. at the times herein mentioned owned, operated and controlled the tug Blackjack 21. The Blackjack 21 was in charge of Joseph Barski, who holds no mariner's license or other certificate issued by any governmental authority.

4. Respondent Moran Towing & Transportation Company at the times herein mentioned owned, operated, manned, navigated and controlled the tug Peter Moran.

5. On the morning of September 19, 1960 at about 6:30, the No. 357 was in tow of the tug Blackjack 21 in Gowanus Creek, Brooklyn, New York, and was in collision with the tug Peter Moran, as a result of which collision No. 357 sustained damage.

6. No employee of libellant was on board the said barge No. 357 at the time or at the scene of said accident and collision; the No. 357 was unmanned.

7. The weather at 6:00 A.M., D.S.T. on September 19, 1960, was overcast, the sky was completely covered with clouds, there was a little fog, visibility was five miles, sunrise was at 6:39, the wind was light easterly.

8. The aforesaid collision and damage were not caused or contributed to by libellant or any agent, servant or employee of the libellant or of the aforesaid barge No. 357.

9. The said barge No. 357 was being towed astern of the said tug Blackjack 21 with stern foremost, connected to the tug by hawsers approximately 10 or 12 feet in length. The No. 357 was loaded with sand and gravel and was bound for Gowanus Creek, having left the Central Railroad pier at 5:45 A.M. and having

come across New York Bay into Buttermilk Channel, into Gowanus Creek.

10. The tug Blackjack 21 was rated at 450 horsepower with a top speed of about 5 knots with a tow. Prior to its passing the Erie Basin it was going about 5 knots an hour; after that, it slowed down to about 3 knots an hour when going into Gowanus Channel. When the captain of Blackjack 21 first saw the Moran tug, he was 3,000 or so feet away and it was after the speed of the Blackjack 21 had been reduced as aforesaid by the sounding of one strong bell.

11. The captain of Blackjack 21 saw the tug Peter Moran at the Bethlehem Shipyard at 29th Street, Brooklyn (about 3,000 feet away) when the Peter Moran was docking a ship and was then backing out into the Channel crossways on the Gowanus Canal about 700 feet abreast of the tug Blackjack 21. The Blackjack 21 gave one strong bell and proceeded along the Gowanus Channel, not changing its projected course.

12. When off Columbia Street, Barski, captain of the Blackjack 21, observed the Peter Moran backing away from the side of a vessel going into drydock, backing slowly towards the Bushey Pier without the use of engines and apparently in the projected path of the Blackjack 21 at about 50 feet away. The Blackjack 21 blew two whistle signals to pass the Moran tug on the starboard side, intending that the Moran tug should go ahead, with engines started. The Moran tug, however, neither replied to the signal nor started its engines.

13. There were two deckhands on the Blackjack 21, one on the stern watching the hawser and one on the bow. The radio on the Blackjack 21 was not working that morning. The captain of the Blackjack 21 did not shout or yell.

14. The Blackjack 21 blew the alarm whistle at about 20 feet away and went on, the Moran tug colliding with the Blackjack 21 amidships with its starboard stern and then collided with the port corner of the No. 357, resulting in damage to the No. 357. The Blackjack 21 claims that it was not in a position to stop suddenly without probable damage to the heavy barge No. 357 being towed because of the position of the Moran tug.

15. While the Blackjack 21 approached the point of collision, one James Brennan, deckhand, employed by Reichert, was stationed on the bow of the tug, although not as a lookout. He saw the tug backing stern first off one of the Brooklyn piers in the vicinity of 29th Street towards the Bushey drydock across the Canal a few hundred feet away from the Blackjack 21. The other deckhand, one Maurice McIntyre, now deceased, was on the stern of the tug Blackjack 21 watching the hawsers. The Channel is approximately 300 feet at this point. The Moran tug is about a hundred feet long. Brennan said he saw no lookout on the Peter Moran. After the collision, no one came out on deck of the Moran tug.

16. The tug Peter Moran had placed a vessel in drydock (#2) at Bethlehem Steel Shipyard at Gowanus Creek, 27th Street, Brooklyn. The tug was steered by Gunnar Larsson, mate. The deckhand was Kenneth Johnson. After receiving an order to cast off from the ship being placed in drydock, the Peter Moran let go the line and backed slowly away from the ship and into the southerly part of the Channel with its stern pointed towards the Ira Bushey dock diagonally in the stream. Larsson put the wheel right and came ahead on the tug to clear the pier stern first. Then the Peter Moran stopped its engines and drifted in a southerly direction into the Channel. The Peter Moran was just away from Pier 3 about a hundred feet and at the time of the collision was lying dead in the water.

17. The tug Peter Moran was rated at 1,200 horsepower and had pilot house control. Its bow was at least 100 feet off the dock; it was not in motion at the time of the collision. It would have taken 10 seconds after starting the engines to secure headway. After two

blasts came the danger signal, and a couple of seconds afterwards came the collision. The Peter Moran had taken no action.

18. Larsson, mate of the tug Peter Moran, stated that he looked before backing away, saw nothing, and then came ahead and drifted and did not see any vessel; he avers he looked before the danger signal but did not see the Blackjack 21; he said that before the collision he was waiting for orders by radio-telephone; he said the lights on the tug and in the shipyard were on. At the time of the collision, the Peter Moran was a hundred feet off the pier; there was no lookout on the stern of the tug, the deckhand was on the bow curling up the lines. Although Larsson gave no signal, there was enough water between the tug's stern and the north side of the Channel for a tug or tow to pass safely.

19. The Peter Moran was close to the path of the uptide or upcurrent vessels. Larsson stated that he looked out of the windows at the rear of the pilot house but saw nothing; he did not blow a whistle signal before backing; he did not know where the signals of the Blackjack 21 came from, and although there was nothing ahead of the Peter Moran, he did not go ahead.

20. The running lights of the Blackjack 21 were on just before the collision.

■ 21. Based upon weather conditions (Finding No. 7) and the fact that the running lights of the Blackjack 21 were on (Finding No. 20), I conclude that statements by Larsson concerning his looking to see if all was clear astern are erroneous, and if such statements were true, then he should have observed the Blackjack 21.

22. After the collision, the tug Blackjack 21 and its tow quickly moved up the channel of Gowanus Creek without slowing or stopping or changing course. In fact, no change of course was made by the Blackjack 21 when its captain saw the Peter Moran coming out of the Channel. The captain of the Peter Mor-

an was unable to identify the Blackjack 21 or her tow. The Peter Moran gave chase to the Blackjack 21, but the Blackjack 21 disappeared under the Hamilton Avenue Bridge, whereupon the Peter Moran abandoned the chase and after getting other orders went on its next assignment.

23. The collision between the Peter Moran and the libellant's barge No. 357 took place just off the end of Pier 3.

■ 24. The Blackjack 21 failed to slow, stop, reverse or change its course in the face of what should have been recognized as a dangerous situation, and it failed to sound the alarm until collision was inevitable.

25. The tug Peter Moran failed to maintain a lookout at the stern, failed to observe the Blackjack 21 and its tow, and drifted out into the navigating portion of the Channel without giving signals and without control.

## DISCUSSION

### BLACKJACK 21

■ It is a general principle that steam vessels must stop their engines in the presence of danger, or even anticipated danger, and the failure to do so has been the cause of condemnation of many vessels where collisions have occurred. The New York, 1899, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126; The Cushing, 2 Cir., 1923, 292 F. 560, 563, 565; The Comus, 2 Cir., 1927, 19 F.2d 774, 777; A. H. Bull S. S. Company v. United States, 2 Cir., 1929, 34 F.2d 614, 616.

■ In the case at bar, prudent seamanship made it imperative that the Blackjack 21 stop or at least slow down and change its course. Instead, it continued at the same speed without change of course into the collision. This constituted negligence in navigation.

■ The failure to sound any whistle signal or alarm until collision was inevitable is ground for liability. Henry Du-Bois Sons Co. v. A/S Ivarans Rederi, 2

Cir., 1940, 116 F.2d 492, 494. In Griffin, On Collision § 80 (1949) it is stated:

"＊ ＊ ＊ where one vessel fails to navigate as she is expected to, it is the duty of the other 'either to repeat her signals or give a timely danger signal, ＊ ＊ ＊' ＊ ＊ ＊.

"The purpose of the danger signal is, of course, to warn the other vessel that there is a misunderstanding or some objection to the proposed maneuver, in order that proper measures may be taken while there is still opportunity ＊ ＊ ＊. It should be blown promptly ＊ ＊ ＊. [Citations omitted]"

## PETER MORAN

██ The Peter Moran was not without fault. It backed into a channel without a lookout and without a signal. It drifted in such a way as to endanger navigation in the channel. As Addison Brown, J., stated in The Non Pareille, D.C.S.D.N.Y.1887, 33 F. 524, 526: "There is no such thing as a 'right of way' to run into unnecessary collision."

Griffin, On Collision § 108 (1949) wrote:

"The obligation to keep a good lookout involves vigilance in every direction in which danger may be expected to arise, and a lookout must be maintained accordingly. This may include a lookout astern. A steamer starting her propeller to back out from her pier, must look to see whether there are vessels near her stern which may be endangered (the Nevada, 106 U.S. 154 [1 S.Ct. 234, 27 L.Ed. 149], [1882]; the Dorothy, C.C.A.2, 189 Fed. 40 [1911], and she must have a lookout astern as she backs into the channel (the President, 1927 A.M.C. 1522; the Hoboken, 1929 A.M.C. 1134; the Hattie Thomas [D.C.], 41 F.2d 881 [sic, p. 270], 1930 A.M.C. 881; Shanks v. Tug N.Y.C. No. 3, C.C.A.2d, 42 F.2d 207, 1930 A.M.C. 1154; the Corsair, C.C.A.2, 37 F. 2d 45, 1930 A.M.C. 207; the Deland, 1931 A.M.C. 257; the Midland Prince, 1932 A.M.C. 563; contra, McFarland v. Selby Co., [D.C.], 17 Fed. 253 [1883]). A vessel which is drifting or manoeuvering in such a way that there may be danger astern must keep a lookout there (the Senator D.C. Chase, C.C.A.2, 108 Fed. 110 [1901]; the Deutschland, [D.C.], 129 Fed. 964 [1904], affirmed C.C.A.2, 137 Fed. 1018; the Saranac, 1924 A.M.C. 1019, affirmed C.C.A.2 [no opinion], 11 F.2d 172; P.R.R. Tug. No. 35, C.C.A.2, 5 F.2d 1012, 1925 A.M.C. 479; the Bronx, 1925 A.M.C. 1158; the Integrity, 1930 A.M.C. 885; Pontin Co. v. the Red Ash, C.C.A.2, 50 F.2d 177, 1931 A.M.C. 1025; the Buffalo, 1933 A.M.C. 1506). ＊ ＊ ＊" (pp. 275–276)

██ A tug which backs out of a slip into a channel without signalling and without a stern lookout is negligent. Hoboken-Pennsylvania Tug. No. 34, D. C.E.D.N.Y., 1929 A.M.C. 1134. See also The Newark, 2 Cir.1923, 289 F. 801; The Herbert L. Pontin, 2 Cir.1931, 50 F.2d 177.

██ A tug which is drifting or maneuvering in such a way that there may be danger astern must keep a lookout astern. The Senator D.C. Chase, 2 Cir. 1901, 108 F. 110; Canal Boat Saranac, D.C.E.D.N.Y., 1924 A.M.C. 1019, aff'd 2 Cir.1926, 11 F.2d 172.

In The Herbert L. Pontin, supra, a steam tug, the Red Ash, was backing out of a slip at the end of the Thirtieth Street Pier in Brooklyn. Chase, Circuit Judge, wrote in part:

"＊ ＊ ＊ It appeared, however, that the Red Ash had no stern lookout. While we agree that she acted to the best of her ability to prevent the accident after the proximity of the Pontin was called to her attention, we do not agree that that was enough to excuse her. When backing out of that slip she was not justified in blindly trusting to good fortune and the warnings of others. It

was her duty to have a stern lookout, and her failure in that respect was prima facie evidence that the collision was due to her fault. The Genesee Chief, 12 How. 443, 13 L. Ed. 1058; the Ariadne, 13 Wall. 475, 20 L.Ed. 542. And it was encumbent upon her, if she would avoid the consequences which usually attach to such a fault, to show that the lack of a lookout did not contribute to the cause of the collision. The Madison (C.C.A. [2]) 250 F. 850. * * *" (50 F.2d p. 177)

The cases cited by respondent Moran, to the effect that a stern lookout was not required, are not applicable. Nassau Barge Corp. v. The Fred B. Dalzell, 2 Cir.1950, 180 F.2d 560, 561, cited by respondent Moran, involved a stationary vessel "waiting her turn to move *forward* into a slip * * *." (Emphasis supplied) Nassau Barge Corp., supra, cites The Herbert L. Pontin, supra, and The Morning Star, 17 F.Cas. page 773, No. 9,817. The Pontin case, supra, is discussed above and clearly requires a stern lookout in this situation. The Morning Star, supra, merely reiterates the general principle that a stern lookout is required when backing or running astern.

■ In the case at bar, during the entire period that the tug Peter Moran backed and drifted astern, there was no stern lookout. The fact that the Peter Moran was motionless at the time of impact does not relieve it from the requirement of having a proper stern lookout until that point.

■ The rule of special circumstances set forth in Title 33 U.S.C.A. § 212 is as follows:

"§ 212. Special circumstances requiring departure from rules (Art. 27)

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Cases involving ships approaching or leaving slips are said to be those of special circumstances. The Transfer No. 18, 2 Cir.1934, 74 F.2d 256; The Coamo, 2 Cir.1920, 267 F. 686; Pennsylvania R. Co. v. Palmer, D.C.E.D.N.Y.1946, 70 F.Supp. 912; The Socony, 2 Cir.1928, 24 F.2d 653; The Transfer No. 17, 2 Cir.1918, 254 F. 673.

In The Transfer No. 18, supra, 74 F. 2d at 257, it is stated:

"There can be no doubt that the case here was one of special circumstances. We have frequently held that, where a vessel is entering or leaving a slip and has not yet begun to navigate on a steady course, and a tow is going up or down the river, the 'ordinary steering and sailing rules and signals made for vessels navigating on definite courses' do not apply, but each vessel must proceed with 'due regard * * * to all dangers of navigation and collision.' The Cherokee (C.C.A.) 70 F. (2d) 316, 317; The New York Central No. 3 (C.C.A.) 42 F.(2d) 207; The Socony No. 19 (C.C.A.) 24 F. (2d) 653, 654; The El Valle (C.C. A.) 25 F.(2d) 619; The William A. Jamison (C.C.A.) 241 F. 950; The Washington (C.C.A.) 241 F. 952; The John Rugge (C.C.A.) 234 F. 861."

The provisions of Title 33 U.S.C.A. § 367 (the standby section) are no avail here to protect respondent Moran against libellant's claim. This section may raise a rebuttable presumption of the negligence of Reichert as against Moran but it is hardly sensible to say that it relieves Moran of liability to libellant, a third party attempting to hold both respondents.

### NO. 357

The collision and damage in the case at bar were not caused or contributed to by libellant or any agent, servant or employee of the libellant or of the barge No. 357.

It is a recognized principle that a tow's right to recover is not affected by the tug's fault.

"Where the tug is in charge and is guilty of fault, her fault is not imputed to the tow. This rule was established by the decision in the Alabama, 92 U.S. 695 [23 L.Ed. 763] [1876], where it was held that the injured tow might recover her damages in full, one-half from her tug and one-half from the colliding vessel, both of which were in fault, any deficiency in the recovery from one to be made good by the other. The towed vessel, being free from fault, was said to be in the same legal position as cargo (to same effect Sturgis v. Boyer, 24 How. 110, [65 U.S. 110] at 122 [16 L.Ed. 591]). The same rule was laid down in the Atlas, 93 U.S. 302 [1877] with respect to the rights of the owner of cargo on the towed vessel. In neither case was the tug's fault imputed to the innocent tow or cargo. In the John G. Stevens, 170 U.S. 113, 126 [18 S.Ct. 544, 42 L.Ed. 969], [1898], the court spoke of 'the familiar practice * * * which allows the owner of a tow injured by a collision caused by the conduct of her tug and of another vessel, to sue both in one libel, and to recover against either or both, according to the proof at the hearing.'

"The law is thoroughly settled to this effect, and has been applied in many cases, of which the Tonawanda [D.C.], 3 Fed. 588 [1880] and the Galileo [C.C.], 28 Fed. 469 [1886] are examples. See too the Arturo [C.C.], 6 Fed. 308, 312, 313 [1881]. The rule in England is the same (the Devonshire, [1912] App. Cas. 634, [1912] Prob.Div. 21)." (footnotes omitted) Griffin, On Collision § 180 (1949).

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this suit and the parties thereto.

2. The collision and damage in the case at bar were not caused or contributed to by libellant or any agent, servant or employee of the libellant or of the barge No. 357.

3. Blackjack 21 was at fault for failing to slow, stop, reverse or change its course in the face of what should have been recognized as a dangerous situation, and it failed to sound the alarm until collision was inevitable.

4. The tug Peter Moran was at fault in failing to keep a stern lookout, in failing to see the approach of the Blackjack 21 and its tow No. 357, in permitting the tug to drift out into the channel in the navigating portion thereof without giving signals and without control.

5. The tug Blackjack 21 and the tug Peter Moran were within the jurisdiction of this court at the time of the institution of this suit and at the time of the damage upon which the suit is based.

6. Libellant is entitled to an interlocutory decree to sustain its claim for liability against the tug Blackjack 21 in rem and to sustain its claim for liability against the tug Peter Moran in rem.

7. The tug Blackjack 21 shall bear one-half of the damages to which the libellant is entitled; the tug Peter Moran shall also bear one-half of the damages to which the libellant is entitled. Any balance which the libellant is unable to collect or enforce against one of the said respondents shall be paid by the other respondent.

8. The libellant is entitled to a provision in the said interlocutory decree providing for a reference to a Commissioner to determine the damages to which it is entitled, with costs and interest, if any, as determined by this court, upon the entry of the final decree herein.

Submit interlocutory decree on notice in accordance with the foregoing.