THE MISSOURI RIVER PACKET COMPANY v. THE HANNIBAL & ST. JOSEPH RAILROAD COMPANY, *Appellant.*

1.   **United States Bridge Act of 1866:** OBSTRUCTION OF NAVIGATION: JURISDICTION. The first section of the act of congress of July 26th, 1866, " to authorize the construction of certain bridges," etc., (14 U. S. Stat. at Large 244,) did not confer upon the district courts of the United States exclusive jurisdiction of litigation arising from any obstruction of navigation by any bridge built under the act, but only jurisdiction concurrent with that of the state courts in such cases.

2.   ———: ———: LIABILITY FOR DAMAGE BY OBSTRUCTION. If in the construction of a bridge over a navigable river, a departure be made from the terms of an act of congress authorizing it, the bridge will, to that extent, be an unlawful structure, and the owners liable for any damage which it may cause or help to cause to any vessel navigating the river in charge of a pilot exercising usual and ordinary care and skill.

3.   ———: CONSTRUCTION OF DRAW-SPAN. The above act provided that the piers of any draw-bridge to be built thereunder, should be parallel with the current of the river, and the spans on each side of the pivot-pier should not be less than 160 feet in length in the clear. *Held,* that in order to comply with the act, not only must the piers be parallel with the current, but the spans next to the pivot-pier must be 160 feet long, in the clear, measured on a line at right angles to the current; and that measurement on a line crossing the cur-

rent at any other angle would not give 160 feet of clear space available for navigation, and was not, therefore, what the act called for.

4. **Measure of Damages.** The proper measure of damages for injuries to a steamboat caused by collision, is the charter value of the boat during the time lost by reason of the injury and the necessary cost of repairs.

*Appeal from Jackson Circuit Court.*—HON. S. H. WOODSON, Judge.

AFFIRMED.

*Geo. W. Easley* for appellant.

*Gage & Ladd* for respondent.

RAY, J.—The petition was filed February 20th, 1875, and contained two counts. The first alleged that prior to the 4th day of March, 1874, the defendant had erected and on said day maintained in the Missouri River near the southern bank thereof at Kansas City, a certain lumber and timber structure; and nearer the center of the river at that point another structure, box-like in form and filled with stone, rising to a height of thirty feet or more above the surface of the river, both of which were obstacles in the way of vessels and rendered navigation dangerous; that said structures were erected and maintained wrongfully and in violation of the rights of the plaintiff and the public to the free and unobstructed use of the river as a highway; that the first mentioned structure had changed the ordinary current of the river which had formerly been parallel to the face of the structures, so that on the 4th day of March, 1874, it flowed with great velocity from the southern shore diagonally across toward the box-like structure near the middle of the river; that while the Alice, one of plaintiff's steamboats, was on said day in the exercise of due care and caution attempting to pass down the river between said structures, it was by the changed current hurled from its course near the shore, out into the river

against said structure of timber and stone, and was by the shock so injured that her repair became necessary, and during such repairs the plaintiff was deprived of the use of the boat, by means of which plaintiff sustained damages in the sum of $2,500, for which it prayed judgment. The second count alleges an injury to the St. Luke, another of plaintiff's boats, occurring in the same way, on the 15th day of September, 1874, and prayed judgment on account thereof for $3,000.

To this petition defendant first interposed a plea to the jurisdiction, alleging " that the structures complained of were a part of the Kansas City bridge, owned by defendant and erected by authority of an act of congress; that the Missouri River was a navigable stream, and that said structures were located within the jurisdiction of the district court of the United States for the western district of Missouri, which court had exclusive jurisdiction of the subject matter of the action."

This plea was heard and overruled by the court and exceptions duly saved; whereupon the defendant filed its answer, which was in substance as follows: The answer consisted of a general denial, and a special defense which stated that congress, by an act approved July 25th, 1866, authorized the construction of a bridge across the Missouri River at or near Kansas City; that the Kansas City & Cameron Railroad Company availed itself of the provisions of said act and built a bridge at Kansas City, which was a pivot draw-bridge with a draw over the main channel of the river at an accessible and navigable point, and with spans of 160 feet in length in the clear on each side of the pivot pier of the draw; that the next adjoining spans to the draw were 250 feet, and were thirty feet above low water mark and ten feet above high water mark, measuring to the bottom chord of the bridge, and with piers which were, at the time of the location and construction thereof, parallel with the current of the river; that the Kansas City & Cameron Railroad Company afterward consolidated with

the defendant, whereby the latter became owner of the bridge, and was such on the 4th day of March, 1874, and thereafter; that under and by authority of said act of congress the defendant maintained said bridge and the structures complained of in plaintiff's petition, which the answer alleged were parts of said bridge; that by means of the premises said bridge was a lawful structure, and that if plaintiff had sustained any damage in consequence thereof, the defendant was not liable therefor, and said act of congress and the alleged compliance with its terms was pleaded as a full and complete bar to plaintiff's action.

The reply specifically denied compliance with the provisions of the act of congress; that the spans were of the required length or that the piers were parallel to the current of the river; or that the structures mentioned in the petition were any part of the bridge.

Upon this state of the pleadings the cause was tried by a jury. The evidence submitted before them, as we gather from the record, is quite voluminous, but we shall only refer to such portions as we deem necessary to a proper disposition of the material questions presented by the record. The sections of the act of congress, authorizing the building of the bridge, are as follows:

Section 2. Any bridge built under the provisions of this act may, at the option of the company building the same, be built as a draw-bridge with a pivot or other form of draw, or with unbroken or continuous spans; provided that if the said bridge shall be made with unbroken and continuous spans, it shall not be of less elevation in any case than fifty feet above extreme high water mark, as understood at the point of location, to the bottom chord of the bridge. Nor shall the spans of said bridge be less than 250 feet in length, and the piers of said bridge shall be parallel with the current of the river, and the main span shall be over the main channel of the river, and not less than 300 feet in length; and provided, also, that if any bridge built under this act shall be constructed as a pivot draw-

bridge with a draw over the main channel of the river at an accessible and navigable point, and with spans of not less than 160 feet in length in the clear on each side of the central or pivot pier of the draw, and the next adjoining spans to the draw shall not be less than 250 feet; and said spans shall not be less than thirty feet above low water mark, and not less than ten feet above extreme high water mark, measuring to the bottom chord of the bridge, and the piers of said bridge shall be parallel with the current of the river; and provided, also, that said draws shall be opened promptly upon reasonable signal for the passage of boats, whose construction shall not be such as to admit of their passage under the permanent spans of said bridge, except when trains are passing over the same; but in no case shall unnecessary delay occur in opening the said draw during or after the passage of trains.

Section 3.   Any bridge constructed under this act and according to the limitations, shall be a lawful structure, and shall be recognized and known as a post route, upon which also no higher charge shall be made for the transmission over the same of the mails, the troops and munitions of war of the United States than the rate per mile paid for their transportation over the railroads or public highways leading to the same bridge.

Section 10.   Any company authorized by the legislature of Missouri may construct a bridge across the Missouri River at the City of Kansas upon the same terms and conditions provided for in this act.

The last paragraph of the 1st section of said act is as follows:  "And in case of any litigation arising from any obstruction, or alleged obstruction to the free navigation of said river, the cause may be tried before the district court of the United States of any state in which any portion of said obstruction or bridge touches."

In regard to the construction of the bridge it appears that it is a pivot draw-bridge, and while its piers are parallel with the current of the river they are not at right

angles to the current or the river, but range diagonally across the current and river. It also appears necessarily, that the superstructure, or the bridge erected thereon, runs diagonally across the piers, the current and the river. It further appears that the act of congress, under which the bridge was constructed, provided that all draw-bridges built under the act should be constructed as pivot draw-bridges, with a draw over the main channel of the river at an accessible and navigable point, and with spans of not less than 160 feet in length, in the clear, on each side of the central or pivot pier of the draw. It also appears that while the measurement along the line or chord of the bridge (which runs diagonally across the piers and the current) gives a distance of 160 feet; yet the open space between the piers when measured at right angles with the piers, or current, was only 153 feet and a fraction. It also appears that the draw-bridge, when swinging open to permit the passage of boats, rested upon two timber structures, called upper and lower draw-rests, which had for their foundation, cribs sunk in the river and filled with rock. There was also an ice-breaker in front of the upper draw-rest, and forming a part of it. In addition to the upper and lower draw-rests, there were four cribs, two above and two below the pivot pier, and between it and the draw-rests. These draw-rests thus connected with the pivot pier, were situated near the middle of the river, parallel with the current, and all taken together extended up and down the river about the length of the draw, and were claimed to be necessary parts of the structure. The head of the upper draw-rest, however, with its ice-breaker attached, was 180 feet above the pivot pier.

On the south side of the south draw opening, a row of pontoons were placed extending from pier No. 1, up the river about 340 feet to the shore, pier No. 1 being about sixty-five feet from the Kansas City shore and being the pier on which the south end of the draw rests when in position. These pontoons were constructed of a number

of flat boats from fifty-three to sixty-five feet in length and from eighteen to twenty feet in width, chained together, so that their outer edge presented a strait line next to the channel, and they thus formed a timber shore or floating dock. These pontoons were nearly parallel with the draw-bridge when open, but gave somewhat greater width at the upper end, on the shore, than at the lower end at pier No. 1 to which it was fastened. At the trial these pontoons were not pretended to be any part of the bridge or structure which the defendant was by law authorized or required to place there, or keep in position. They constitute what the petition denominates, " a certain lumber and timber structure," near the southern bank of the river at that point, while the upper draw-rest with its ice-breaker attached, is what it designates, " another structure box-like in form," etc., situated near the center of the river, etc., both of which are charged to be obstacles in the way of vessels and dangerous to navigation, all of which will be better understood, by the accompanying drawing.

It further appears that the pontoons remained floating and in position until the latter part of the winter of 1873-4, when they sank. The evidence for the plaintiff tended to show that they sank transversely, or in a direction quartering out into the river; that there was a cross current, starting from near the south shore, above the head of the pontoons and running diagonally across the river, in the direction of the upper draw-rest; and that while the boats were attempting to pass the draw-bridge, in charge of skillful pilots, exercising ordinary care and skill, they were caught by the cross current and hurled against the upper draw-rest and injured, whereby they were damaged and disabled and required repairing, which was done at a large expense and outlay; and that they were necessarily detained from service and use for the period of from fifteen to twenty days each; that the charter value or hire of said boats per day was at least $100, and that they could have been readily chartered or hired at that sum. On the other

The Missouri River Packet Co. v. Hannibal & St. Joseph R. R. Co.

hand the testimony for the defendant tended to show that no such cross current existed, and that the injury to boats occurred by reason of want of due care and skill of said pilots in the management of said boats.

On all these several points there was a large mass of conflicting and contradictory evidence, on both sides. There was also much other irrelevant and unimportant testimony, not necessary to notice. On this state of facts, under the issues aforesaid, the court gave for the plaintiff, over the objections of the defendant, the following instructions:

1. Unless the bridge mentioned in the answer had piers which were parallel to the current of the river, and spans of not less than 160 feet in the clear on each side of the pivot pier, then said bridge is an illegal structure and an unlawful obstruction to the navigation of the Missouri River, and if the jury believe from the evidence that it was not such a bridge, and further believe that the plaintiff's boats, Alice and St. Luke, or either of them, while attempting to pass through the draw of the bridge in charge of pilots exercising usual and ordinary care, struck the draw-rest of the bridge, and were thereby damaged, then the jury will find their verdict for the plaintiff, as to such boats.

2. If the jury believe from the evidence that the defendant erected its bridge in such manner that the pier thereof known as the pivot pier, with the draw-rests attached thereto, was not parallel to the current of the river and that the same so remained up to the time of the accidents to the plaintiff's boats complained of; or, if the jury believe from the evidence that the defendant so constructed its said bridge that the span thereof, on the south side of the pivot pier and next adjoining it, was less than 160 feet in length in the clear between said pier No. 1, and said pivot pier or the draw-rest attached; and if the jury further believe from the evidence that plaintiff's steamboats, Alice and St. Luke, or either of them, were while plaintiff was

navigating said river with said boat or boats, by reason of defendant's failure to have said pier parallel to said current, or by reason of defendant's failure to have said span 160 feet in the clear as above, thrown against the draw-rest of said bridge and broken and injured, then the jury will find for the plaintiff for damages so received by the boats or boat so injured; unless the jury are also satisfied from the evidence that the plaintiff's agents and pilots were guilty of negligence or unskillfulness in the management of said boats or boat so injured, and that such negligence or unskillfulness contributed directly to the accident or accidents by which said boats or boat were injured.

3. If the jury believe from the evidence that there was a cross current in the Missouri River setting out from the south shore thereof, near where the pontoons had been fastened to said shore and running thence to the head of the draw-rest attached to the pivot pier, and that said cross current was created by the sinking of defendant's pontoons in the river during the winter of 1873–4, and that while plaintiff was navigating said river with the steamboats Alice and St. Luke, or either of them, and by its pilots using reasonable and ordinary skill and care in handling said boats or boat, said boats or either of them were by the force of said cross current carried against said draw-rest and injured, then the jury will find for the plaintiff the amount of the damage received by such boat or boats.

4. If the jury find for the plaintiff for damages to said steamboats, or either of them, they will find for the amount of the charter value of such boat, during the time of her necessary detention by reason of such injury, and also for the cost of necessary repairs caused by such injury, as the same are shown by the evidence, not exceeding however $2,500 for damages to the Alice and $3,000 for damages to the St. Luke.

The defendant asked no less than eighteen instructions, only two of which were given by the court; one of them, No. 18, in a modified form, to-wit:

17. If the jury believe from the evidence that the pontoons were placed at the upper end of pier No. 1 after consultation of the bridge engineer and the steamboat interests at St. Louis, at which the plaintiff was present by its officers and consented to the placing of said pontoons there; that thereafter, and in the spring of 1874, they requested the removal of said pontoons; that thereafter, and before the accident to the St. Luke, the defendant removed said pontoons by pulling them out and allowing them to float away or be used, except such portions of one or two of them as were under the mud and deposit, then you can find no damages on the second count by reason of such alleged obstructions, unless you also believe from the evidence that the cross current caused by the sinking of said pontoons remained and existed at the time of such accident.

18. If the jury believe from the evidence that any of plaintiff's officers and agents had notice that the pontoons in evidence were sunk or out of position so they could not be used, and had caused a cross-current dangerous to navigation at the time of the injury to the St. Luke, then it was the duty of her officers and agents to have exercised a degree of care and skill in descending through the draw of the bridge in question commensurate with the increased danger, and if the jury believe from the evidence that such care and skill were not exercised in attempting to descend through said draw, they will find for the defendant on the second count in plaintiff's petition.

The court also, of its own motion, gave the following instructions, over the objections of both parties, to-wit:

1. If the jury find from the evidence that at the time the damage was done to plaintiff's steamboat "Alice," the water in the north draw of said bridge was of sufficient depth and width to have passed said boat safely through the same with ordinary care and skill of the pilot on said boat, and the south draw of said bridge was filled with floating ice, and had a cross-current running there through in the direction of the breakwater named in plaintiff's petition, and

said pilot ran said boat through the south instead of the north draw of said bridge, and in doing so was wanting in proper judgment, care and skill, amounting to negligence, which contributed directly to the damage sustained by said boat, they must find for the defendant on the first count of said petition.

2.   If the jury believe from the evidence that, at the time of the injury complained of in the second count of plaintiff's petition as done to the steamboat St. Luke, the water in the north draw of the defendant's bridge was of sufficient depth and width to have enabled the pilot on said boat, with ordinary care and skill, to have run said boat safely through the same, and that at the same time a cross-current was running through and across the south draw of said bridge in the direction of the breakwater named in said second count, and that said pilot ran said boat through the south instead of the north draw of said bridge, and in doing so was wanting in proper judgment, care and skill, amounting to negligence, which contributed directly to the injury sustained by said boat, they must find for the defendant on said second count.

There was a verdict for plaintiff for $5,300, and judgment accordingly, from which the defendant, in due time and manner, appealed to this court.

The first question presented for our consideration by this record is the plea to the jurisdiction.   This, we think, was properly overruled.   The language of the act of congress relied on in support of this plea is as follows:   "And in case of any litigation, arising from any obstruction, or alleged obstruction to the free navigation of said river, the cause may be tried before the district court of the United States of any state in which any portion of said obstruction or bridge touches."   The only purpose and effect of this provision was to confer jurisdiction upon the federal court, and not to divest or exclude the common law jurisdiction of the state courts over such litigation.   In such cases the com-

1. UNITED STATES BRIDGE ACT OF 1866; obstruction of navigation: jurisdiction

490 SUPREME COURT OF MISSOURI,

The Missouri River Packet Co. v. Hannibal & St. Joseph R. R. Co.

mon law jurisdiction of the two courts is concurrent. There was, therefore, no error in overruling this plea.

The next question arises upon the special defense, set up in the answer and here relied on, to the effect that the bridge and structures complained of were built under and in compliance with the authority of the act of congress of July 25th, 1866, and are therefore lawful structures, and. that, if plaintiff has sustained any damage in consequence thereof, the defendant is not liable therefor.

2. ——: ——: liability for damages by obstruction.

The law applicable to this question, and pertinent to this case, is well expressed by Wood on the Law of Nuisance, in sections 302, 596 and 621, to the following effect: "Whatever is authorized by statute, within the scope of legislative powers, is lawful, and therefore cannot be a nuisance. But this must be understood as subject to the qualification, that when an act, that would otherwise be a nuisance, is authorized by statute, it only ceases to be a nuisance so long as it is exercised within the scope of the powers conferred. * * But if the powers of the act are exceeded, or are exercised in a manner different from that provided in the grant of authority, the grant will be no protection, and the party doing the acts will be chargeable for a nuisance at the suit of persons injured thereby, the same as though there had been no color of authority given for their exercise. * * The rule at present recognized may be stated to be, that where a person sustains a special damage peculiar to himself, either in person or property, direct or consequential, from a public nuisance, whether arising from the obstruction of a highway, or from any cause, he shall have his remedy therefor." These positions are abundantly supported by the authority cited, and are believed to be a correct statement of the law upon this subject.

In the first place, it must be remembered that in a proceeding like this it is not necessary to inquire or determine whether the bridge in question is so far unlawful and unau-

·thorized, as to be subject to removal as a public nuisance. With that question we have now nothing to do and we express no opinion upon it.  As has been said elsewhere : "It ' may be that in a case presenting that question, it might be held that the obstruction to navigation is so slight as to be tolerated, in view of the greater aid to commerce rendered· by the structure."   But upon the facts of this case, and for the purpose of this action, in the language of the same court, " It is sufficient to say that if the structure is not according to the limitation of the act of congress it is so far unauthorized, and the defendant‍is therefore liable for any injury to the plaintiff's vessels, which was caused, or contributed to, by the unlawful structure."   *Missouri River Packet Co. v. Hann. & St. Jo. R. R. Co.*, 2 Fed. Rep. 290. This, we think, is the fair construction and legal effect of the plaintiff's instructions on this branch of the case.  These instructions, when viewed, as they should be, in the light of the issues and evidence in the cause, will, we apprehend, be found to contain nothing substantially antagonistic to the law on this subject as above announced in Wood on the Law of Nuisances.

On the question of compliance with the act of congress in the construction of the bridge, the evidence on this point, 3. ——: construc- as we have seen, is to the effect, that while tion of draw-span. the piers of said bridge are parallel with the current of the river, they are not at right angles to the current of the river; but range diagonally across the current and the river ; and that the ʻstructure thereon necessarily runs in the same direction, and at the same angle.   The evidence also shows that while the measurement along. the line or chord of the bridge gives a distance of 160 feet, yet the open space between the piers and the structures connected therewith, when measured at right angles with the piers or the current, was only 153 feet and a fraction.   Was this a compliance with the act of congress in' question ? We think not.   If such a reduction from such a measurement is permissible, why may not a larger reduction from,

a wider departure from the true line directly across the current, be justifiable? In construing the act we must look to its spirit and reason. Its purpose manifestly was, as has been said, to reserve for the purposes of navigation, 160 feet of open space, in the clear, wholly unobstructed and available for the passage of vessels. This result, as we have seen, is not obtained by measurement along the chord of the bridge, running as it does diagonally across the piers, the current and the river, and such measurement cannot therefore be the correct one, or within the intendment of congress in the passage of the act. It follows therefore that the structures in question, under the law and evidence in this case, and for the purposes of this action, are so far unauthorized as to render the defendant liable for any injuries to plaintiff's vessels which were caused or contributed to by the unlawful structures, while such vessels were attempting to pass through the draw of the bridge in charge of pilots exercising usual and ordinary care and skill. *Missouri River Packet Co. v. Hann. & St. Jo. R. R. Co.*, 2 Fed. Rep. 285; *Dugan v. Bridge Co.*, 27 Pa. St. 303; *Jolly v. Terre Haute Bridge Co.*, 6 McLean 237; *Columbus Ins. Co. v. Curtenius*, 6 McLean 209, and authorities cited.

There are other minor questions incidental to this one, mentioned in the briefs, which are either necessarily involved in the decision of this one, or otherwise unnecessary to a proper disposition of the case, and need not be further noticed.

As it was not pretended at the trial, as we have seen, that the pontoons or lumber and timber structures near the southern bank of the river at that place, were any part of the bridge or structure which the defendant was by law authorized or required to place there or keep in position, they were confessedly illegal structures and unauthorized obstructions to navigation, and the instructions for plaintiff on that point are clearly unobjectionable and need no comment.

The instructions given by the court of its own motion,

if subject to any criticism, are in no sense prejudicial to the defendant, and it cannot complain of them. Of the eighteen instructions asked by the defendant, the seventeenth and eighteenth were given, the latter in a modified form. Many of the others were in substance the opposite of those given or otherwise antagonistic to the law of the case as hereinbefore declared. The rest of them were either mere legal abstractions or otherwise unimportant to the proper solution of the case.

The next and only remaining question necessary to notice is as to the measure of damages, and the instructions 4. MEASURE OF DAMages. in that behalf. The instruction for the plaintiff on this question, under the pleadings and evidence in the cause, we think, is unexceptionable. The jury were thereby told that if they found for the plaintiff, they would find for the amount of the charter value of such boat during the time of her necessary detention by reason of such injury, and also for the cost of necessary repairs caused by such injury, as the same are shown by the evidence, not to exceed, however, $2,500 damages to the Alice, and $3,000 for damages to the St. Luke. This case is clearly distinguishable from that class of cases where it has been justly held that speculative damages, or such as depend upon the probable profits and losses of steamboats during contemplated voyages, are altogether too uncertain and indefinite to be made the subject of judicial inquiry before a jury. In such cases the jury would have to weigh mere probabilities, and their task would be a mere calculation of chances. Not so under this instruction. The investigation in this particular is limited to the simple inquiry of the charter value or hire of the boats, for the period of their necessary detention for the purpose of repairs. This question is simple in its nature, of easy ascertainment, and not obnoxious to the objection of chance, speculation and probabilities. It is as easy to ascertain as the rental value of a house for a given period, or the monthly salary of a clerk. And as we have seen that there

was evidence before the jury tending to show the amount of the charter value or hire of the boats in question, we see no just objection to the instruction, upon the evidence in the cause. *Missouri River Packet Co. v. Hann. & St. Jo. R. R. Co.*, 2 Fed. Rep. 294; *Williamson v. Barrett*, 13 How. 110; *The Baltimore*, 8 Wall. 387; *The Cayuga*, 14 Wall. 278; *The Morning Star*, 4 Biss. 62; *Whitehall Trans. Co. v. N. J. Steamboat Co.*, 51 N. Y. 369; *Mailler v. Ex. Propeller Line*, 61 N. Y. 316.

Upon the whole, the case seems to have been fairly tried, under proper instructions, and as the evidence on all the controverted points was conflicting and contradictory, the finding and judgment thereon will not be disturbed.

For these reasons the judgment of the circuit court is affirmed. All concur.