instead of parting inside they would go out into the front of the house, he by the stoop and she by the basement, to kiss good-bye for the day in the presence of neighbors, pedlers and street sweepers.

And the wife of this same street sweeper is called to prove the adultery of April, 1905, which is alleged in the complaint, and found by the trial judge on her evidence. She says that she was working in the said house next door of Mrs. Bauer, and she and her husband slept in the rear hall bedroom on the third floor, which was separated by the party wall from the bedroom of the said servant of defendant in his house; that at midnight one night in April, 1905, while her husband was asleep and she awake, she heard the servant say, "Mr. Keville, you have been drinking," and heard him also talking and recognized his voice through the wall, though not his words, so loud was he also talking. She knew it was his voice though she had never talked with him, or heard him speak, except that she had heard him call his children in from his stoop on some previous occasion. This is all bad enough, but when we consider that at that time this plaintiff and her son and daughter were living there with the defendant, what are we to say of it? If this defendant lodged with his servant in her bedroom, and they talked there so loud as to be heard in the next house, were they not heard in his own household?

Of these four witnesses, three are of the household of Mrs. Bauer, and they all admit, as does also the other, the old vegetable vender, that they went to Mrs. Bauer's and there met the plaintiff before this action was begun. Though they told no one else, they seem to have told everything to Mrs. Bauer, and she prepared the case for the plaintiff. Her meddlesomeness is revealed. She and the witnesses actually breathed together, and she could not refrain from being a witness herself, although her testimony is not of particular account.

Moreover, this servant remained in the house until after October 19, 1905, when the defendant left his house on account of disagreements with the plaintiff, i. e., for more than a year after the first alleged adultery, without the plaintiff or any of the household seeing or hearing any impropriety between her and the defendant, much less knowing that he was a visitor or a lodger in the servant's bedroom, and participated in loud altercations there.

If there be a suspicion that the defendant and the servant were too intimate, that does not suffice.

The judgment should be reversed on the law and the facts.

Judgment reversed on the law and the facts, and new trial granted; costs to abide the final award of costs. All concur, but HIRSCHBERG, J., not voting.

---

### SAAL v. SOUTH BROOKLYN RY. CO. et al.

(Supreme Court, Appellate Division, Second Department. November 22, 1907.)

1. APPEAL—DECISIONS APPEALABLE—NATURE OF DECISION.

A judgment enjoined defendants from maintaining an ash-receiving station in such manner as to cause a nuisance to plaintiff's property, and provided that, if the nuisance should be continued, plaintiff might apply for a modification of the judgment, so as to absolutely forbid the use of

the station. Subsequently, on plaintiff's application, it was ordered that such modification be made, and the court found that the nuisance continued up to the hearing of such application, that it was a daily violation of the former judgment and a contempt of court, and that plaintiff's rights were prejudiced, and referred the question of plaintiff's damages, if any; the question of punishment to await further report. *Held,* that the last decision was essentially a judgment, and hence appealable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Appeal and Error, § 548.]

**2. SAME—INTERLOCUTORY JUDGMENT.**

An interlocutory judgment is appealable under the express terms of Code Civ. Proc. § 1349.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Appeal and Error, § 329.]

**3. CONTEMPT—DEFINED.**

A contempt is a willful disregard or disobedience.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Contempt, § 5. For other definitions, see Words and Phrases, vol. 2, pp. 1489–1492; vol. 8, p. 7614.]

**4. SAME—"CONSTRUCTIVE CONTEMPT."**

To constitute constructive contempt of court, some act must be done, not in the presence of the court or judge, that tends to obstruct the administration of justice, or bring the court or judge or the administration of justice into disrespect.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Contempt, § 1. For other definitions, see Words and Phrases, vol. 2, pp. 1468–1469.]

**5. SAME—EVIDENCE—REASONABLE DOUBT.**

To find one guilty of constructive contempt of court in disobeying an order thereof, the proof must show beyond reasonable doubt that defendant willfully refused to do what was directed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Contempt, § 185.]

**6. REFERENCE—REFEREE'S REPORT—EFFECT.**

In an action to enjoin a nuisance, where a referee's report is confirmed by the court, the adjudication necessarily rests on such report, although it is not binding upon the court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Reference, §§ 150–154.]

**7. INJUNCTION—VIOLATION—CONSTRUCTIVE CONTEMPT—ACTS CONSTRUED.**

Contempt should not have been adjudged against defendants, who were previously enjoined from maintaining an ash-receiving station in such manner as to cause a nuisance to plaintiff's property, though the method of operating the station was not beyond criticism, where many of the defects upon which the injunction was based had been minimized to harmlessness, and marked improvements had been made at large expense.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 448.]

**8. MUNICIPAL CORPORATIONS—ASH-RECEIVING STATION—RIGHT TO MAINTAIN.**

A city may maintain an ash-receiving station within the city, in disposing of ashes, household and street sweepings, and rubbish, if the method adopted does not create a nuisance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 1341.]

**9. INJUNCTION—SCOPE AND EXTENT—RESTRAINING INJURY TO PROPERTY.**

It was improper to absolutely forbid the maintenance of an ash-receiving station used by a city in disposing of ashes, household and street sweepings, and rubbish, where, since a previous injunction against its use in such manner as to cause a nuisance to plaintiff's property, nearly all the objectionable features of the station have been obviated, and such as remain may be obviated, and where the annoyance to plaintiff is

insignificant, if not imaginary, since an injunction restraining the con-
duct of a legitimate business should go no further than is absolutely
necessary to protect the rights of him seeking the injunction.

Appeal from Special Term, Kings County.

Action by Ann Saal against the South Brooklyn Railway Company
and others. From a judgment for plaintiff, defendants appeals. Mod-
ified and affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, RICH,
JENKS, and MILLER, JJ.

James D. Bell (Patrick E. Callahan, on the brief), for appellant city
of New York.

Charles A. Collin (Thomas L. Hughes and John L. Wells, on the
brief), for other appellants.

James W. Treadwell (Lewis R. Conklin, on the brief), for re-
spondent.

JENKS, J. The action is by a property owner for an injunction
against the working of an ash-receiving station. It came to trial in
1904, but the trial was adjourned until November 16, 1904, under a
promise of improvements to obviate the grievances. On that day
the trial began, and was continued until December 2, 1904. Mean-
while improvements had been made at an expense of $3,900. The
Special Term made a decision on June 9, 1905, and on it a judgment
was entered which awarded $250 rental damages up to December 2,
1904, as of the conclusion of the trial, and costs. The judgment
further provided:

"Second. That the defendants, and each of them, their respective servants
and agents, be and they are hereby enjoined and restrained from the mainte-
nance and use of the said ash-receiving station and approaches, referred to in
said decision, in such manner as to cause a nuisance to plaintiff's said real
property. On or after September 15th next plaintiff may apply, on five days'
notice, to the justice who tried this action, or to the court, upon proof that
the nuisance still continues, for a modification of the judgment in such wise
that it shall absolutely and unconditionally forbid the use of the defendant's
said property as an ash-receiving station, and thereupon such modification
shall be made."

On September 30, 1905, the plaintiff applied to the Special Term
for modification of the judgment so as to secure an injunction ab-
solute. That court heard the application on October 17, 1905, and
thereupon made an order of reference to take testimony upon the
following question of fact and to report the same:

"Did the nuisance still continue on October 17, 1905, the date of the hear-
ing of the motion of the plaintiff for an absolute injunction and an order
adjudging the defendants guilty of contempt? * * * Said referee shall re-
ceive all testimony material to this question, and shall embody in his report
the evidence taken upon said question and his conclusions therefrom. * * *
It is further ordered that the referee's report and opinion, together with the
testimony taken by him, be filed with the clerk of this court, and that there-
after an application may be made by either party, upon notice of not less
than five days, upon said judgment and decision, and upon said motion papers,
and upon said report, opinion, and testimony, for an order deciding and de-
termining all questions raised by said plaintiff's motion."

The referee took testimony of which the record contains over 2,500 folios, and reported on June 25, 1906. The Special Term thereupon ordered the defendants to show cause why the judgment theretofore entered should not be modified, "and why, in accordance with the terms of said judgment," a further judgment should not be entered forbidding the use of the defendants' property as an ash-receiving station, and why an order or judgment should not forthwith be entered adjudging the defendant guilty of contempt. After a hearing it was ordered that the referee's report be confirmed, that the judgment of June 9, 1905, be modified, so as to forbid absolutely and unconditionally the use of the ash-receiving station and approaches, as supplementary to the judgment of June 9th and in execution thereof, and the "order" then proceeded:

"And this court does hereby find, upon said testimony, report, and papers, that the nuisance enjoined by said judgment of June 9, 1905, continued unabated from the date of entry of said judgment to and including October 17, 1905; that thereafter (although somewhat modified) it continued up to and including the date (April 11, 1906) of the close of the hearing before said referee; that the continuance of said nuisance, as above found, from June 9, 1905, to April 11, 1906, was a daily violation by the defendants and each of them of said judgment of June 9, 1905, and of the injunction therein contained, and was a contempt of this court. (6) That said misconduct of each of the defendants in this action was calculated to, and actually did, defeat, impair, impede, and prejudice the rights and remedies of the plaintiff in this action."

The court thereupon appointed a referee to take proof and report whether plaintiff has suffered actual loss or injury by reason of such misconduct, and the amount thereof; all question of punishment to await the coming in of the further report. This appeal was taken by the defendants from the "final judgment or order" entered on July 12, 1906—i. e., that which I have just described—and the appellants gave notice that they intended to bring up the "interlocutory judgment of June 9, 1905." But upon the hearing here the appellants did not seek a review of the judgment of June 9th which awarded damages and costs; that is, they did not ask for a reversal and a new trial as to the relative rights of the parties as determined as of December 2, 1902. The relief sought by this appeal is a modification by the "order" or judgment that "the continuance of said nuisance, as above found, from June 9, 1905, to April 11, 1906, was a daily violation by the defendants and each of them of said judgment of June 9, 1905, and of the injunction therein contained, and was a contempt of this court; (6) that said misconduct of each of the defendants in this action was calculated to, and actually did, defeat, impair, impede, and prejudice the rights and remedies of the plaintiff in this action; * * * and that all questions as to the punishment of defendants for such misconduct await the coming in of such further report"—and also the provision of absolute injunction.

The respondent contends that the provisions adjudging a contempt, but postponing the punishment until the coming in of the report, are but interlocutory, and not appealable, and that the only method of review is appeal from a judgment, when entered, imposing punishment for the contempt. I think that this determination of the

court appealed from is not an order. The judgment of June 9th provided for an application for a modification thereof. The appli-- cation of September 30th was made pursuant to that provision, and the decision of the court thereon ordered that such judgment be modified accordingly, expressly stating that the "order" is supple- mentary to the judgment of June 9th and in execution thereof. The "order" is in its effect an amendment of the judgment, and it is this judgment as amended which contains the direction of the court. The "order," then, is but the vehicle whereby the judgment is amended. The determination of the court is the decision of a trial, not a mo- tion, and hence it is essentially a judgment, whatever it may be termed. The judgment determines that the defendants are guilty of a contempt, and but postpones the punishment thereof. It mat- ters not, however, whether it is an interlocutory judgment, for it is none the less appealable. Section 1349, Code of Civil Procedure.

I think that the provision adjudging a contempt should not stand. A contempt is a willful disregard or disobedience. Bouvier, Dict. The alleged contempt is indirect or constructive, which is well de- fined in Matter of Dill, 32 Kan. 668, 5 Pac. 39, 49 Am. Rep. 505:

"To constitute constructive contempt of court some act must be done, not in the presence of the court or judge, that tends to obstruct the administra- tion of justice, or bring the court or judge or the administration of justice into disrespect." 7 Am. & Eng. Ency. of Law, p. 28.

The proof must show beyond a reasonable doubt that the defend- ant had willfully refused to do what the court directed. Watertown Paper Co. v. Place, as Assignee, 51 App. Div. 633, 64 N. Y. Supp. 673, citing Matter of Elias, 40 App. Div. 632, 57 N. Y. Supp. 987. Now, it must be borne in mind that the first judgment of the court did not, as I have shown, prohibit the defendants absolutely. And, again, it is to be noted that there was no prohibition of any express acts, so that it cannot be said that the proof could possibly show di- rect disobedience of specific commands. The mandate should be so clearly expressed, when applied to the act complained of, that the violation must appear by reasonable certainty. Ketchum v. Edwards, 153 N. Y. 534, 47 N. E. 918. Indeed, the disposition of the court was indicated by this utterance at the close of the trial:

"I think it is perfectly practicable to confine these ashes so that they will not escape in the air, and I am not satisfied, and this business can be con- ducted consistent with your rights, and my disposition is to enjoin the con- ducting of this business so far as it makes a nuisance.

"Counsel: We will want a reasonable time to make other improvements."

The adjudication of the court, so far as the facts of the nuisance are concerned, necessarily rests upon the report of the referee, which was confirmed by the court, although the court was not bound thereby. Drexel v. Pease, 129 N. Y. 96, 29 N. E. 241. The original findings show that the nuisance consisted in separating the contents of the carts before they were dumped, and depositing the separated part upon a platform at the rear of plaintiff's premises, where it remained until carried away by other carts, and that such material was some- times foul and stench-giving; that the work done in hauling the loads

of ashes and refuse up an inclined approach and delivering them within the walls necessarily involved noise and jar; that by reason of the work and its manner of doing clouds of dust and ashes poured out of the open ends and the open sides of the ash-receiving building, and out of the carts, which were left uncovered; that the drivers of the carts used loud and profane language; that the building and approaches were so constructed and so arranged as to cause the acts complained of, save, of course, the uncovered carts and the disorderly conduct.

Even though the defendant was not absolutely enjoined, yet, if it had continued to use the self-same plant in the self-same way, quite another question would have been presented, because it was bound to understand that such continuance was adjudged to be nuisance. But the court had declared at the end of the trial that it was practicable to carry on the business consistent with the plaintiff's rights, and had forbidden only the business "in such manner as to cause a nuisance to plaintiff's said real property." If, then, the defendants could change the conditions, and did change the conditions, even though the changes were not beyond criticism when put into practical operation, I fail to see how the learned Special Term could determine that defendants' conduct in continuing the business under such changed conditions was a willful disobedience of the court's command. The referee reported that the defendant had made alterations and changes in and about the building, platform, and approach, and he reported at considerable length, not only radical and costly changes, but also the construction of a new brick building. He further reported that the defendants had continued to use, operate, and maintain said station the same as before, "except as such use, occupation, and maintenance have been varied or modified by the changes hereinabove found." He further reports:

"Since the new incline was completed the vibration of plaintiff's dwelling house caused by the ascending and descending of carts on said old incline has practically ceased; and the noise of carts ascending and descending on the new incline is much less than it was on the old one. The closing of the door and window in the receiving building at or near the head of the old incline, the inclosing of the hoppers under said building, and the building of the said vestibule, and the use of the curtains therein, the sprinkling of the dust, dirt, and ashes as they are unloaded into the hoppers inside of said building, have to some extent diminished the escape of ashes, dust, and dirt from said station, but to what extent I am not able to determine; and the erection of the brick building between plaintiff's premises and the new incline above found has, since its completion, practically prevented the ashes, dust, and dirt which escapes out of the vestibule or entrance of said building from blowing into or upon plaintiff's said premises. No change has been made in the said ash station, or in the use, operation, and maintenance thereof, except as above noted, and there has been no abatement of the said nuisance in any respect, except as above found."

Perhaps it would be hypercritical and unjust to say that the conclusion is a non sequitur; but it does seem that the corrections as reported have almost, if not altogether, obviated the grievances of the plaintiff. In other words, the defendants, even on the showing of the referee, have so far abated the defects complained of that mere continuance of the business under those changed conditions does not

justify a finding that there was a constructive contempt of court. It appears that after the entry of the judgment in June, 1905, and on receipt of a letter from the general manager, the chief engineer immediately took up diligently the study of the question of the complaints, and familiarized himself with the conditions, and then·prepared plans of improvement and obviation of the defects. The plans were acted upon. A new ramp was set up, the ash pocket was inclosed, inclosures were built, the old openings were closed up, and a new·stairway was constructed. The crane was inclosed, a vestibule was built at the head of the ramp, and the change in the covers of the hoppers was begun. All this was by October 17th. A new building was begun. It is unprofitable to detail all of the evidence, but I think that it is clear that many of the alleged defects had been minimized to harmlessness, if not eradicated. The changes were radical and at large expense, and the results were a marked improvement, so far as the vibration, the cartage of ashes, the drafts of air, and the conduct of the business are concerned. I do not say, nor is it necessary to say, that the operation of the plant was shown as beyond criticism; but I do think that the thorough, radical, and costly changes made were in good faith, and that it does not sufficiently appear that after these changes the defendants, by the mere conduct of the business, on October 17, 1906, under such changed conditions, were guilty of a contempt.

This ash-receiving station is one of the regular stations in this borough·of the city, as part of the municipal system in the disposal of ashes, of household and street sweepings, and of household and street rubbish. The plaintiff's premises are a three-storied wooden building on an ordinary city lot. The first floor consists of shop and rooms for the shopkeepers, and the two upper stories are used as tenements. The premises are less than 100 feet from an elevated railroad structure running on the bank of a cut not yet physically walled as a street. In the cut are the tracks of the defendant. Before the ash station was built the plaintiff's premises were bounded on the north and west by the lands of the railroad company. Conceding that such station may be conveniently located within the bounds of the city, there could be little or no force in the contention that the site was a scar on the neighborhood. The streets.must be cleaned, and it does not appear but that the method employed is proper, and even essential, in the system employed. The right to carry on such work, if the manner and method adopted "does not create a nuisance," must be supported. Coleman v. City of New York, 70 App. Div. 218, 75 N. Y. Supp. 342, affirmed 173 N. Y. 612, 66 N. E. 1106. I think that the learned Special Term was right when it remarked at the close of the trial that it seemed perfectly practicable to conduct the business consistent with the plaintiff's rights. A reading of the record impresses me that almost all of the features which could characterize the station as a nuisance have almost been obviated, and that such as remain may be eradicated. The test of efficiency is experience. It could not be expected that the changes in the station, however thorough, might not require still again changes and additions. The superintendent very properly testifies:

"Certain conditions may arise, or may have arisen. Some little things may occur to us at times. If I find any little thing I think may improve the station—I may not have thought of it six months before—it is done."

About all that remains as cause of nuisance is the floating ashes. As to this annoyance even the plaintiff's case shows that the volume thereof has greatly diminished, while the testimony of the defendants, which to my mind greatly preponderates, shows that the present annoyance is insignificant, if not imaginary. Be this as it may, I think that the evidence shows that it may be entirely corrected, for the testimony of Engineer Klapp shows that ashes might be blown through the eaves where the joists are not air-tight, and it also appears that there was an accumulation of ashes under the trestle previous to the changes which had never been cleared up; and it does not appear that the other sources of escape, if any, may not be corrected.

I think that the learned Special Term went too far, under the circumstances, in its judgment of absolute prohibition; for "injunctions restraining the carrying on of a legitimate and lawful business should go no further than is absolutely necessary to protect the rights of the parties seeking such injunction. When a person is engaged in carrying on such business, he should not be absolutely prohibited from doing so, unless it appears that the carrying on of such business will necessarily produce the injury complained of. If it can be conducted in such a way as not to constitute a nuisance, then it should be permitted to be continued in that manner." Chamberlain v. Douglas, 24 App. Div. 582, 48 N. Y. Supp. 710. I think that the evidence was not sufficient to justify the court in shutting down this business, but that the court should have ascertained whether the working of that business was not possible without causing a nuisance, and, if so, what specific orders, changes, and regulations were proper and necessary to that end, that the same might be written at the foot of the judgment. If the business cannot be thus conducted, or if thereafter it should appear that the defendants would not obey the further commands of the court, then it might well be that an absolute prohibition in the protection of private rights should issue. Chamberlain v. Douglas, supra.

The judgment is modified in accord with this opinion, and, as modified, affirmed, without costs. All concur, except HIRSCHBERG, P. J., not voting.

