PEOPLE ex rel. KUHNE v. BURR, Justice of Supreme Court. (Supreme Court, Appellate Division, Second Department. June 5, 1908.) Certiorari by the people of the state of New York, on the relation of August Kuhne, against Joseph A. Burr, justice of the Supreme Court, to review a determination of the Special Term adjudging relator guilty of contempt. Order affirmed, upon opinion at Special Term. 107 N. Y. Supp. 1020. Edward Lazansky (James D. Bell, Joseph J. Corn, and Louis Franklin Levy, on the brief), for relator. Stephen C. Baldwin, for defendant.

PER CURIAM. Order affirmed, upon the opinion of Mr. Justice Burr at Special Term.

MILLER, J. (dissenting). The relator seeks by certiorari to review a determination of the Special Term adjudging him guilty of a willful disobedience of a lawful mandate of the court, to wit, a writ of habeas corpus, and directing that he be imprisoned in the county jail of Kings county for a period of 30 days and pay a fine of $250, or in default thereof be imprisoned in the said jail until said fine is paid, or for the further period of 30 days. Such a deter-

mination may be reviewed by certiorari. People ex rel. Taylor v. Forbes, 143 N. Y. 219, 38 N. E. 303. Section 8 of the Code of Civil Procedure, in so far as applicable, provides: "A court of record has power to punish for a criminal contempt, a person guilty of either of the following acts, and no others: * * * (3) Willful disobedience to its lawful mandate." Said writ of habeas corpus was allowed by a justice of the Supreme Court on the 26th day of November, 1907. When allowed it read as follows: "Writ of Habeas Corpus. People of the State of New York to the Police Officers or Other Persons in Charge of John G. Jenkins, Jr.: We command you that you have the body
           Frank
of ~~John G.~~ Jenkins, Jr., by you imprisoned and detained, as it is said, together with the time and cause of such imprisonment and detention, by whatsoever name the said John G. Jenkins, Jr., is called or charged, before me, a justice of the Supreme Court, forthwith and immediately upon the receipt of this writ at my chambers in the courthouse, in the borough of Brooklyn, city of New York, to do and receive what shall then and there be considered concerning the said
       Frank
~~John G.~~ Jenkins, Jr., and have you then and there this writ. Witness, Hon. Joseph A. Burr, one of the justices of this court, the 26th day of November, 1907. Allowed. Jos. A. Burr, J. S. C." The name "John G.," as originally typewritten, had been stricken out in two places, and the word "Frank" interlined with a pen, as indicated supra. In the petition attached to the writ the name "Frank" had been substituted in the same manner for the name "John G." wherever that name had appeared as originally typewritten. Said writ was issued and served under the following circumstances:

John G. Jenkins, Jr., and Frank Jenkins, were indicted by a grand jury of Kings county, and bench warrants for their arrest were issued by the district attorney and delivered to the relator on the morning of said 26th day of November. The relator, who was acting captain of the detective bureau of the police department in the borough of Brooklyn, gave said warrants to two officers to be executed. Thereafter on said day said Frank Jenkins voluntarily appeared in County Court, was arraigned, and released on bail, but on leaving the courthouse was arrested by said officers, who, against his protest and that of his counsel, Mr. Baldwin, proceeded to take him to police headquarters, where it was feared he would be photographed and measured according to the custom of the police department. Earlier in the day Mr. Baldwin had prepared the papers to obtain a writ of habeas corpus on behalf of John G. Jenkins, Jr., in anticipation of an attempt by the police to photograph and measure him. Said papers were hurriedly changed as hereinbefore stated, the writ was allowed by a justice of the Supreme Court, and an effort was made to serve it on said officers before they had reached police headquarters with their prisoner; but they disregarded the attempted service. Another attorney, Mr. Wilson, then took said papers, and upon reaching police headquarters noticed that the name "John G. Jenkins, Jr.," still appeared in two places in the writ. He thereupon struck

out the name "John G." and substituted the name "Frank" with a fountain pen which he carried. The relator, who was in command at headquarters, attracted by the commotion in the outer room caused by the crowd of people who had gathered there, entered the room while the sergeant at the desk was taking the prisoner's "pedigree," as the term is used by the police, and while Mr. Wilson was making said changes. It is undisputed that he had no knowledge of what had transpired up to that time and that he was not then informed thereof. He observed Mr. Wilson writing on the paper which was forthwith delivered to him. About that time Mr. Baldwin arrived at the office. The relator examined the writ and petition, and demanded to know who had made the alterations. Mr. Wilson made no reply.

There is some conflict between the relator and the people's witnesses as to the precise conversation that followed; but, except in one particular presently to be noted, there is no conflict upon any matter of substance. They differ as to the phraseology used, as to who made certain statements, and as to the manner exhibited by the relator; but such variance does not justify the inference that any witness has intentionally testified falsely. The relator concedes the important facts, to wit, that the paper was served on him, that he was told that it was intended for the prisoner, and that he directed the prisoner to be taken upstairs, understanding that that direction meant "to photograph him." The people's witnesses do not agree as to all the details of the transaction; but that fact makes for, not against, their credibility. The only matter of substance about which there is any conflict is the reply made to the relator's question respecting the changes in the writ, and the testimony of Mr. Baldwin on that subject is more favorable to the relator than his own. The relator testified that Mr. Baldwin replied that he did not know who made the changes. Mr. Baldwin testified, and is corroborated by the other witnesses, that he said to the relator that the changes had been made before Judge Burr signed the writ. If Mr. Baldwin made that reply, the relator knew, though he did not, that the statement was untrue, and it is quite immaterial whether he afterward asked the relator if he understood his responsibility. The prisoner was taken upstairs, as directed by the relator, and at once photographed and measured. Immediately after giving that direction the relator called up the district attorney's office by telephone, and informed Assistant District Attorney Smith, who answered, what had occurred. The latter advised him not to disregard what even purported to be an order of the court, but to produce the prisoner at once, and he immediately called to the officers having the prisoner in charge, was informed that he was then on his way downstairs, and then directed that he be taken to the judge's chambers, while the relator went to the district attorney's office and there related to Assistant District Attorney Elder all that had occurred. Mr. Elder, believing from the account given him that the writ had been issued for John G. Jenkins, Jr., and afterwards changed to Frank Jenkins, prepared a return to the effect that the relator did not have

111 N.Y.S.—72

the body of John G. Jenkins, Jr., in his custody, and went with the relator to the judge's chambers to make return to the writ. Forty minutes had elapsed from the time the prisoner was first taken to police headquarters. When the return, prepared as aforesaid, was filed, the judge demanded a return to a writ issued for the production of Frank Jenkins, and a return was then prepared by Mr. Elder, signed by the relator, and filed, to the effect that at the time the writ was served the relator had the said Frank Jenkins in custody by virtue of a bench warrant, which was the fact. The prisoner was discharged upon the consent of the district attorney, it being undisputed that he had been arraigned and had been released on bail, and thereupon the proceeding resulting in the conviction of the relator of a criminal contempt of court as aforesaid was instituted.

Section 2028 of the Code of Civil Procedure makes special provision for the punishment of disobedience to a state writ; i. e., the imprisonment of the offender until he makes return to the writ and complies with the order of the court. The relator could not be punished under that section, because he made return to the writ and produced the prisoner. He is charged with contempt of court, not for failing to make return and to produce the prisoner, but for the manner in which he complied with the order of the court; i. e., for doing what he knew the writ was intended to prevent before complying with it. The purpose and intent of the relator thus become the determining factors in the case. The burden was on the people to prove beyond a reasonable doubt that the relator was guilty of a willful disobedience. Saal v. South Brooklyn Railway Co., 122 App. Div. 364, 106 N. Y. Supp. 996. The relator testified that he believed that the writ and petition had originally been prepared for John G. Jenkins, Jr., and had been changed in his presence to suit the case of Frank Jenkins; that all of the changes in the writ and petition, some ten in number, had been made by Mr. Wilson at police headquarters; that the whole writ was a fraud, gotten up on the impulse of the moment by the attorneys to prevent their client from being photographed and measured; and that he did not even believe that Judge Burr had ever signed the writ. The writ was most informal in appearance. While the judge's signature, with which the relator was not acquainted, appeared below the word "Allowed" indorsed on the writ, it was not attested by the clerk, nor was the seal of the court affixed, as required by section 1992 of the Code of Civil Procedure. Had the seal of the Supreme Court been affixed to the writ, the relator would have had undoubted proof that it was a solemn document backed by the dignity and power of the Supreme Court; and that was doubtless the main purpose of the statutory requirement. I assume that the writ was nevertheless valid, and that obedience to it could have been compelled as prescribed by said section 2028; but whether a paper not authenticated as required by statute can be the basis of a prosecution for a criminal contempt of court is a very different question. See People ex rel. Clapp v. Fisk, 1 Hun, 464. We do not need to decide that ques-

tion now, and I shall only consider the absence of the required proof of genuineness in connection with the other circumstances as bearing upon the question whether the relator was justified by appearances in entertaining the belief that the writ was not genuine, because, if he was, we must all agree that he could not be convicted of a criminal contempt of court for not immediately producing the prisoner. The paper bore unmistakable evidence of having originally been prepared for John G. Jenkins, Jr., for whose arrest the relator also had a bench warrant. The relator had seen Mr. Wilson writing on the paper, and when it was handed to him the ink was still wet in some of the places where the name "Frank" had been interlined. I think that any one might reasonably have reached the conclusion that all the changes appearing on the paper were made at one and the same time. The relator says that he thought the whole thing was a fraud—a trick to deceive him and to prevent him from following the practice of the department. Without expressing any opinion as to the propriety of the act of Mr. Wilson in making said changes, I think that his act at least justified the inference that the paper was not in fact a solemn mandate, which could only issue upon an allowance thereof personally signed by the judge. See section 727, Code of Civil Procedure. But, more than that, his belief was confirmed by the silence of Mr. Wilson when he demanded to know who made the changes. It matters not whether Mr. Baldwin said that he did not know who made the changes, or what the relator knew to be untrue, that they were made before Judge Burr signed the writ. The important thing is that the man whom the relator had seen writing on the paper and who had concededly made some of the changes was silent. If upon the relator's demand Mr. Wilson had explained exactly what he had done, then perhaps, and probably, the incident would have ended without complication. Mr. Wilson says that he did not consider it any of the relator's business. However that may be, and aside from the question of the propriety of giving the information demanded, the relator is at least entitled to the consideration that he sought an explanation before he acted, and that the person from whom he might reasonably have expected an explanation allowed him to draw his own conclusions from appearances. Had all of the participants in that transaction been possessed of the calmness of judgment exhibited by Mr. Smith, the advice of the latter need not have been required.

The relator frankly concedes that he knew that Mr. Baldwin was trying to prevent the prisoner being photographed, and that he, the relator, intended, if possible, to circumvent him; but that does not prove that he intended to disobey the order of the court, as assumed by the learned justice who adjudged him guilty of contempt. That purpose might characterize the act of the relator as a willful disobedience, if he was not justified by the appearances in believing that the paper served on him was not genuine; but as he was justified in that belief, and actually entertained it, his purpose to defeat Mr. Baldwin ceases to be of importance, except as it explains his conduct consistently with the absence of any intent to disregard the order of the court. The fact that he produced Frank Jenkins after he had the same advice of Mr. Smith to do so does not cast doubt on the sincerity of the belief which he says he entertained when he directed the photographing of the prisoner. That of itself was not a contempt of court, and we are not concerned on this appeal with the right of the police to photograph prisoners. The sole question is what was his belief, purpose, and intent at the time when he ordered that to be done. This conviction cannot be sustained because he acted hastily or imprudently. He has not been tried on charges for unfitness, nor for unlawfully photographing and measuring the prisoner, nor, again, for a false arrest and assault. He has been convicted of a criminal contempt of court, which must be proven beyond a reasonable doubt; and even if the case turned on the preponderance of the proof I should incline to the view that the conviction could not be sustained, because it seems to me that the conceded facts show that the relator was justified by the appearances in entertaining the belief that the paper served on him was not a genuine writ requiring the immediate production of Frank Jenkins.

A suggestion is made that the relator was guilty of contempt in making the two returns as aforesaid. It is sufficient to say on that point that he has not been tried or convicted on that charge. Moreover, those returns were prepared by Mr. Elder after he had been informed of all that the relator knew about the transaction, and I am unable to discover any reason to criticise Mr. Elder for preparing those returns or the relator for signing them on his advice. Certainly the fact that the relator undertook to comply with the order of the court according to the advice of counsel, upon whom he had a right to rely, does not prove that he was guilty of a willful disobedience in the first instance. It appears from the opinion of the learned justice whose determination we are reviewing that he had some doubt whether a conviction as of a criminal contempt was justified, for he said: "But, if there was any question about the power of the court to punish as for a criminal contempt, clearly it exists to punish for a civil contempt. In this case the right of the relator in this special proceeding to personal liberty and immunity of person, and his remedy to preserve this, have been defeated and impaired by the conduct of the respondent." But it is conceded that the order adjudges the relator guilty of criminal contempt, and can only be sustained on that theory.

Much evidence was received over the objection of the relator respecting the conduct of the detectives in arresting the said Frank Jenkins and dragging him through the streets to police headquarters, as the opinion of the learned justice below expressed it. It is not pretended that the relator knew that the prisoner had been released on bail before his arrest on the bench warrant, or that he had any knowledge whatever of the conduct of said detectives. It can hardly be said that the relator has not been prejudiced by such testimony. I have not considered the many technical questions argued

by the learned counsel for the relator, for the reason that, irrespective of them, I am unable to concur in the view that there was sufficient evidence to warrant the conviction of the relator of a criminal contempt of court.