## McDONALD v. CITY OF NEW YORK.

Circuit Court of Appeals, Second Circuit.
December 16, 1929.

No. 60.

William J. Leonard, Matthew J. Troy, and Arthur J. W. Hilly, Corp. Counsel, all of New York City, for appellant.

Clement E. Dunbar, of New York City, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge. At the foot of Lincoln avenue on the east side of the Harlem River, in the borough of the Bronx, the city of New York maintains an ash dump. To the north and south, extending to the water front, are railroad yards, and the neighborhood on both sides of the river is given over to industry or transportation, and, so far as the evidence shows, is substantially without residences. The ashes and similar waste are carried away from the streets in dump carts, which back to the dumping log of an open pier some 22 feet above mean low water. Here the backboards of the carts are opened, the bodies raised, and the contents slides off and falls into open scows, which lie below alongside the bulkhead. The length of the fall depends in part upon the height of the tide, but in all cases there arises a cloud of dust, which fills the air and, when there is a wind, moves with it to the adjoining water or land, as the case may be.

On the day in question the libelant was at work upon a lighter, moored at the bulkhead of the New Haven Railroad, south of, and close to, one of the city's scows. The tide was low and a cart some 15 feet away dumped its load into the scow and raised a cloud of ashes and cinders, which a moderate northwest wind carried upon him. A cinder lodged in his eye, and caused an injury which the District Court found to result in a detached retina, and, eventually in the loss of sight of the eye. This is the cause of suit.

The city has many dumping places along the water front, and has tried various devices to confine the dust which arises in their use. Tarpaulins were at one time set from the ends of the dumping boards to the scows, but they were abandoned, because they did not accommodate themselves to the changes of tide, and did more harm than good. At another time chutes were employed, with flaps at the end, but these, too, were discontinued; they caused more dust, the waste being confined, and descending solid and with greater momentum. For a time a hose was played upon the load as the scow was filled, but this caused the load to split, the scows to become tender, and so much endangered their stability that the trimmers refused to work. At 139th street, less than half a mile further up the Harlem River and on the opposite side, was a dump, not completed at the time of this accident, the platform of which was inclosed on three sides and on top. It does not appear what is the occupation thereabouts, but the effort was to keep the dust from making towards the shore. When the wind is off the water, this is somewhat successful, but it can protect the river little, if at all. A dump at Seventy-Second street is probably built in the same way, though the evidence is contradictory, nor does it appear at that place, also, what is the adjacent occupation. These have been the only efforts to control the dust, and, so far as appears, all that can be done. No device whatever is apparent by which the river can be protected, if the work is to be done at all. The District Judge held that it was not necessary for the libelant to prove that there were any, because the work as carried on was a "nuisance" anyway, and the city was liable for any injuries which might arise.

A great city must somehow dispose of its rubbish; to that end the charter of New York provides for the assignment by the department of docks to the street-cleaning commissioner of wharves and piers at which he may load scows (sections 542(1), 836), and so by implication for the carriage of the waste to sea. In loading the scows, there is an inevitable span between the cart tail and the scow's bottom, through which the rubbish must fall, and when it lands it will inevitably throw up a cloud of dust, whose confinement is the only feature of the whole work within any one's control. Unless the city has neglected to use some available precautions, the courts of New York have held such dumps not to be a nuisance. Coleman v. City of New York, 70 App. Div. 218, 75 N. Y. S. 342, affirmed 173 N. Y. 162, 66 N. E. 1106; Riverdale Realty Co. v. City of New York, 168 App. Div. 103, 153 N. Y. S. 742; affirmed 225 N. Y. 683, 122 N. E. 889; Storm v. N. Y. (Spec. T'. N. Y. Co.) 238 N. Y. S. 143. Such, too, is the rule elsewhere. Denver v. Porter, 126 F. 288 (C. C. A. 8); Newcastle v. Harvey, 54 Ind. App. 243, 102 N. E. 878; Nashville v. Mason, 137 Tenn. 169, 192 S. W. 915, L. R. A. 1917D, 914. In Saal v. South Brooklyn Ry., 122 App. Div. 364, 106 N. Y. S. 996, the court seems to have entertained the notion that a similar dump on shore might be a nuisance, even after everything possible was done; but that was in a neighborhood apparently residential, at least in part. When properly constructed and watched, and when situated where they interfere least, such structures are lawful.

Since Workman v. N. Y., 179 U. S. 552, 21 S. Ct. 212, 45 L. Ed. 314, we must hold that this case is governed by the maritime law, the injury taking place in navigable waters. Atlantic Transport Co. of West Virginia v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157. Theoretically it may be necessary,

therefore, for us to form our own judgment, independently of what the New York courts have said. We should still have to be well convinced that the interests of shipping were so paramount to those of the city as to compel a different compromise from what has seemed just to the state tribunals. When we say that something is a "nuisance," it is shorthand for describing our conclusion as to such a compromise, and the word is apt to conceal the process. The question is, indeed, not one of fact, though courts have at times said so; its answer turns upon which of the two opposed interests the court will in the end prefer. The implied major premise involves a choice of values, something quite different from deciding what has happened in the order of nature; however we may disguise it, it is legislation in petto, like much else that courts do. In saying that we adopt the rule of the state law, we must therefore decide, as we do, that the interest of shipping to be free from dust and cinders is not in our judgment so important as to deny the city power to dispose of its rubbish by water, provided it uses the best means available to reduce the annoyance.

It can do so in two ways, by the site selected and the means employed. There can be no doubt that the foot of Lincoln avenue is as good a location as could be chosen. Constantly fouled by the smoke of yard locomotives, the air can seldom be pure, and the clouds of dust must add little, if at all, to the squalor of the spot. Those so assailed suffer so much from what already exists that their added discomfort is less serious than that of others, who work or live in more fortunate surroundings. Even so we might agree that they should be protected, so far as that was consistent with the prosecution of the work, if the record suggested anything except a housing like that at 139th street and perhaps at Seventy-Second. While it is possible that this does some good to the land, we cannot see how it would serve the river, where nothing will help appreciably, except what will actually confine the dust. The necessity we could impose might indeed prove the mother of invention, but we cannot entirely abandon what the record shows, and, unless we do, the demand appears to be for the impossible.

We need not hold that, had it been shown that the situation was one where a housing should have been set up in the interest of any one, the libelant could not complain of its omission, though, because of his position at one side, it would not have tended to avoid the injury which he suffered. For argument we may assume that, if unlawful at all, the city would be liable for any damage it might cause. Missouri Packet Co. v. Hannibal, etc., R. R., 79 Mo. 478. True, the omitted precaution might in that case be in the interest of others than the libelant, but it is at least open to doubt whether for that reason we should assimilate the putative requirement to one imposed by a statute or regulation passed in the interest of a class. St. Louis, etc., R. R. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290; Di Caprio v. N. Y. C. R. R., 231 N. Y. 99, 131 N. E. 746, 16 A. L. R. 940; Corris v. Scott, L. R. 9 Exch. 125. Such questions do not arise at all, until it appears that a housing would protect some who might claim protection. This is not the case.

Decree reversed; libel dismissed.